THE BOARD OF SUPERVISORS OF IOWA COUNTY VS. THE MINERAL POINT RAILROAD COMPANY and others.

*Pleading and decree in foreclosure — Question of priority of lien, when to be considered adjudicated — When cestui que trust bound by judgment against trustee — Whether trust personal or official.*

| 24 | 93 |
|----|----|
| 76 | 683 |
| 24 | 93 |
| 80 | 212 |
| 24 | 93 |
| 98 | 405 |
| 24 | 93 |
| 109 | 596 |
| 24 | 93 |
| 115 | 413 |

1. Certain allegations (in a bill in the U. S. district court), of mixed law and fact, in regard to the paramount lien of a mortgage there sought to be foreclosed, as against a mortgage to the present plaintiffs which was prior in date, *held* a sufficient averment of the priority of such lien *as a matter of fact.*

2. The issue as to such priority having been distinctly made by the pleadings, the decree in that suit is conclusive against the present plaintiffs, who were defendants therein, by their trustee.

3. *It seems* that in a mortgage foreclosure it is *error* to determine a claim of title *hostile to the mortgagor*, though litigated; but *quære* whether the judgment is *void.*

4. But priority of lien as between two mortgages by the same mortgagor may be litigated in a foreclosure of one of them.

5. The omission from a bill in chancery of any prayer for relief, except that for process, may be taken advantage of by demurrer, or perhaps at the hearing; but it is not a *jurisdictional* defect.

6. A decree in foreclosure which adjudged that the defendants named, including one who held a mortgage of prior date, but which is distinctly charged in the bill to constitute a subordinate lien, should be barred and foreclosed, etc, *held* to determine the question of priority thus raised, although it does not expressly state that such defendant's mortgage is subordinate to the one in suit.

7. Where a mortgage to A. in trust was given to secure the holders of negotiable bonds, they would be bound by the judgment in a suit to foreclose another mortgage, alleged to be a paramount lien, wherein A. was made defendant as such trustee.

8. If the bonds contained stipulations which destroyed their negotiability (making them mere bonds of indemnity to the payee), *but this did not appear from the mortgage*, the payee would still be bound by such judgment.

9. A statute authorized the execution of a mortgage "to the treasurer of the state and his successors in office, in trust," for certain persons; and the mortgage was made to "Edward H. Janssen, treasurer of the state of Wisconsin, and his successors in office." *Held*, that the trust was not personal to said Janssen, but devolved on his successors in office. *Delaplaine v. Lewis, Governor, etc.*, 19 Wis. 476, distinguished.

10. A decree is not void as between the parties before the court, by reason of the absence of a "necessary party."

APPEAL from the Circuit Court for *Iowa* County.

Chapter 117, Private and Local Acts of 1853, provides that it shall be lawful for any county through which the Mineral Point railroad shall run, "or any town or incorporated city or village in such county, to issue and deliver to said company its bonds, payable to such person or persons, trustees or corporation, or to said company, * * as may be agreed upon by and between the directors of said railroad company and the proper officers of such county ; * * to receive in exchange for such bonds the stock or bonds of said railroad company ; * * but no such bonds shall be issued or delivered to said company, * * unless a majority of the legal voters of such county, * * voting on the question, shall first have voted in favor of such issue," etc. The second section provides, that it shall be lawful for said railroad company "to issue its bonds, payable to the treasurer of the state and his successors in office, or to bearer, in sums of $1,000 each, which shall not exceed, in the aggregate, $10,000 per mile of the whole surveyed line of said railroad, * * with a provision making them transferable by general or special indorsement, or by delivery, and all such bonds which shall be delivered to any such county, town or incorporated village, in exchange. as aforesaid, shall contain a stipulation guarantying the payment of the principal and interest which shall become due and payable, on the bonds of said county, town, incorporated city or village, received in exchange therefor by said company ; and, to secure the payment of such bonds and interest, it shall also be lawful for the said company to execute and deliver to the treasurer of the state and his successors in office, in trust for the use and benefit of the holders of any and all of said bonds, a deed of conveyance, to be called a second mortgage, of all the present and future to be acquired property of said company, in said railroad, including the right of way and land occupied by said road, together with the superstruction and tracks

thereon," etc., etc.; "which said second mortgage shall be taken, deemed and held to be subject and subsidiary to another deed of conveyance, to be called a first mortgage, of all the aforesaid property; which said first mortgage, whether it shall have been executed prior or subsequent to said second mortgage in point of time, shall constitute the first lien upon said railroad and all of the aforesaid property; but said first mortgage shall not be issued to secure the payment of bonds to a greater amount than $10,000 per mile of the whole length of said road; * * and whenever said second mortgage shall be delivered to the treasurer of the state, and recorded in the office of the secretary of state, it shall constitute a perfect and indefeasible lien upon said railroad, and upon all the property described in it, subject only to the prior lien created by said first mortgage." The act further provides how the railroad company shall make proposals in writing to any county for an exchange of its stock or bonds for the bonds of such county, and how the proposition shall be submitted to, and determined by the electors of such county, etc.

In May, 1853, the railroad company proposed to the board of supervisors of Iowa county that the proper officers of said county should execute and deliver to the company one hundred and fifty bonds of the county, for $1,000 each (payable in July, 1868, and with interest payable semi-annually), and that the county should receive in exchange for its said bonds an equal number of "the second mortgage convertible bonds" of the company, for $1,000 each, convertible into stock of the company at the option of the county, at any time before maturity, etc., to be issued in accordance with the above mentioned act, and to be payable to the treasurer of the state and his successors in office, or to bearer (the interest payable semi-annually, and the principal July 1, 1868), to be transferable by general or special indorsement, or by delivery, and to be part of an issue of bonds which

should not exceed, in the aggregate, $10,000 per mile of the whole of the surveyed line of said railroad, and to contain a stipulation guarantying the payment of the principal and interest which should become due and payable on any of the Iowa county bonds received by the company in exchange for its bonds, and that the payment of any such sum of principal or interest on said county bonds should operate as a release and discharge of said railroad company from the payment of the same amount of the principal and interest of the bonds so issued by it. To secure the payment of its said bonds, the company proposed to execute and deliver, in conformity with said act, to the state treasurer and his successors in office, in trust for the use and benefit of the holders of any and all said bonds, a deed of conveyance, to be called a second mortgage, on all the property then owned, or thereafter to be acquired, by the company; which said second mortgage, the proposal further stated, should be held "subject and subsidiary" to another deed of conveyance thereafter to be executed, of all said property, to be called a first mortgage, which should constitute the first lien upon said railroad and all of said property, but should not be made to secure the payment of bonds to a greater amount than $10,000 per mile of the whole length of said road. This proposition being approved by the board of supervisors, and by the electors, of said county, the company, in July following, executed one hundred and fifty bonds of the character above and hereinafter described. It also executed a mortgage, which recites the execution of said one hundred and fifty bonds, in pursuance of the act of the legislature above mentioned, and describes said bonds by naming the amount, rate of interest, payee, time and place of payment, etc., and also describes them as "transferable by general or special indorsement, or by delivery," and as containing "a stipulation guarantying that the said *Mineral Point Railroad Company* will

pay the principal and interest which shall become due and payable on one hundred and fifty certain bonds of the said *County of Iowa*" (describing them); and also as containing "the agreement of said company to transfer to said *County of Iowa*, at any time when said county shall elect to receive the same, before the first day of July, 1868, on the delivery of said bonds to the treasurer of the company, a corresponding amount of the capital stock of said company in exchange for, and satisfaction of, said bonds; which said bonds are part of an issue of bonds which shall not exceed, in the aggregate, $10,000 per mile of the whole of the surveyed line of said railroad, the residue of which are hereafter to be executed." Said mortgage runs to Edward H. Janssen, treasurer of the state of Wisconsin, and his successors in office, in trust for the use and benefit of the holders of said bonds, or any of them; and it purports to be made to secure the payment of said one hundred and fifty bonds, and of such other bonds of a similar description as should thereafter be executed, "part of an issue of bonds which should not exceed $10,000 per mile," etc. A clause in the conditional part of the deed states, that it is to be held a second mortgage, and "subject and subsidiary to another deed of conveyance" of the same property, thereafter to be executed to such other party as the company should elect, which should be called a first mortgage, and should constitute the first lien upon the property, but should not be made to secure the payment of bonds to a greater amount than $10,000 per mile of the whole length of said railroad, etc. This mortgage was delivered to the state treasurer, and recorded in the office of the secretary of state; and the company and *County of Iowa* exchanged their respective bonds for $150,000, described in said mortgage.

In December, 1853, the *Mineral Point Railroad Company* entered into a written contract with Robert Schuyler and George L. Schuyler, doing business in the city

of New York under the name of R. & G. L. Schuyler, by which the latter agreed to complete said road, and receive in payment, among other things, $500,000 of bonds of the company, to be secured by a first mortgage on all its property; and afterward a mortgage or trust-deed, dated January 2, 1854, was executed by said company of all its property and franchises, in which deed George L. Schuyler was named as grantee in trust for the holders of bonds described therein, and which the same was given to secure. The mortgage describes each of said bonds as "being authenticated by a certificate signed by said [Schuyler] to the effect that said [railroad company] had executed to him a deed of trust or mortgage to secure the prompt payment of the principal and interest of each and every of said one thousand bonds." One thousand bonds for $500 each, purporting to be bonds of the company, were accordingly prepared, bearing date the day and year last mentioned, payable to George L. Schuyler, or the holder, January 1, 1874, with interest payable semi-annually. Said mortgage or trust-deed was recorded in the office of the secretary of state of this state, February 21, 1854, and was delivered to George L. Schuyler. The one thousand bonds, signed by the president and secretary and with the seal of the company affixed, were also left in the possession of R. & G. L. Schuyler in May, 1854. There was no certificate upon them by the trustee, as recited in the Schuyler mortgage, showing that they were secured by that mortgage. Robert Schuyler and George L. Schuyler did not enter upon the construction of said road; and, in July, 1854, they made an assignment of their property for the benefit of their creditors. One hundred of the bonds had been deposited by the Schuylers, as collateral security for loans obtained by them. The rest of the bonds were all delivered up to the agents of the *Mineral Point Railroad Company* by the assignee of R. & G. L. Schuyler, and were canceled. Seventy of the one hun-

dred bonds above named were also reclaimed and canceled by the company. The other thirty passed into the hands of one Keep, while the latter was acting as director of the company ; and in the suit hereinafter mentioned, brought by *Martin* and *Coman* in the United States district court for Wisconsin, they were adjudged to be void, and were delivered up and canceled by order of the court.

On the 1st of January, 1856, said *Mineral Point Railroad Company* executed a mortgage or deed of trust upon all its property and franchises, running to *D. R. Martin* and *L. D. Coman*, of the city of New York, as grantees in trust for the holders of the bonds in said instrument described, and which it was given to secure. These bonds were six hundred and forty in number, each for $500, payable to *Martin* and *Coman*, or bearer, in 1881, with interest payable semi-annually ; and they were paid out for materials and labor used in the construction of the road.

In April, 1856, said railroad company issued two hundred other bonds, each for $500, dated January 1, 1856, payable to Charles Kuehn, treasurer of the state of Wisconsin, or his successor in office, or bearer, July 1, 1868, with interest payable semi-annually, similar to the bonds issued to plaintiff, except that they declared upon their face that the holder was entitled to the benefit of a certain described sinking fund, which, it was further expressed, was sufficient to redeem the whole of said bonds before they became due. Each of these bonds purported on its face also to be secured by the Janssen mortgage. In July,. 1856, the company issued one hundred and forty other bonds of the same character, except that the holder was not therein declared to be entitled to the benefit of any sinking fund. On each of these three hundred and forty bonds was a certificate signed by Charles Kuehn, treasurer of the state of Wisconsin, as trustee, stating that such bond

was "included in a mortgage on the lands," etc., of said railroad company, executed in trust to said treasurer, under which bonds might be issued not exceeding $10,000 per mile, "subject to a first mortgage of $320,000." These bonds were paid to the defendant *Beecher*, as contractor, by whom the railroad was constructed.

In April, 1859, *Martin* and *Coman*, being then citizens of New York, commenced a suit in the district court of the United States for the district of Wisconsin, against the *Mineral Point Railroad Company*, Samuel D. Hastings, treasurer of the state of Wisconsin, John M. Keep and Thomas McFarland, citizens of this state, and George L. Schuyler, to foreclose the above-mentioned mortgage to them, and for other purposes. The bill of complaint, among other things, recites the execution of the above-mentioned mortgage or deed of trust from the railroad company to Edward H. Janssen, then treasurer of the state of Wisconsin, and his successors in office; that said Samuel D. Hastings was, at the time of the filing of said bill, the successor of said Janssen in the office of treasurer of said state, etc.; and that said mortgage or deed of trust was, by its terms, to be considered "subject and subsidiary" to another deed of conveyance by said company of all its property, to be called a first mortgage, and which should constitute a first lien upon the property, etc. The bill then recites the execution and delivery of the mortgage or trust-deed to George L. Schuyler, but alleges that the bonds described in such mortgage were not, nor were any of them, ever transferred, sold or negotiated by the railroad company, or by any person thereunto authorized; that, at the time of the execution and delivery of said mortgage to Schuyler, it was contemplated by the *Mineral Point Railroad Company* to cancel the Janssen mortgage, and to surrender to the county of Iowa the $150,000 of the bonds of said county

in exchange for $150,000 of the company's bonds secured by said Janssen mortgage; that the company, having abandoned this project, said mortgage or trust-deed to Schuyler was by said Schuyler, on the 1st of January, 1856, delivered up to said *Martin* and *Coman*, and all the bonds to secure which the same was executed were also delivered to them and canceled, except some thirty bonds, which, the bill charges, then were and continued to be the property of said railroad company. The bill recites facts to show a breach of the conditions of said mortgage or trust-deed to *Martin* and *Coman*, and that said trustees were authorized to bring the suit. It then alleges that, at the time of the execution of the conveyance to Janssen, and of the bonds intended to be secured thereby, it was intended and understood by all the parties interested in said Janssen mortgage, that the same should be subject to another mortgage on said road for $320,000; that, in executing said mortgage, the controlling motive for so executing the same was, that said railroad company might comply with the aforesaid act (chapter 117, Laws of 1853), and receive in exchange for $150,000 of its second mortgage bonds a like amount of the bonds of Iowa county; that $150,000 of said bonds were delivered to said county of Iowa, in pursuance of the provisions of said act, in exchange for the like amount of the bonds of said county; that, said railroad being a matter of public importance to the people of said county, the object and intention of the county in this exchange of bonds was to aid said railroad company in the construction of its road, by loaning to it the credit of the county, to the amount of $150,000, and to leave the resources of said company unimpaired for the purpose of completing said road, and to that end it was the intention and understanding of said county and said company, that the company, for the purpose of completing the road, should have full power to create a debt of $320,000 (said railroad being thirty-five miles in

length), which debt, though created subsequently to said Janssen mortgage, should take precedence thereof. The bill then charges that the remaining sum of $170,000 of bonds provided to be issued in said Janssen mortgage were subsequently issued to *Luther Beecher*, as contractor for the construction of said road, and that it was the intention of the company, and the person to whom said bonds were issued, that the same were and should be "subject and subservient" to a prior lien thereafter to be created on said road, for the purpose of completing the same, to the amount of $320,000. It then charges the fact to be, that said mortgage or trust-deed to Janssen, and the debt thereby intended to be secured, "was and is subject and subsidiary to the mortgage or trust-deed" to said *Martin* and *Coman*, then in suit, and to the debt thereby intended to be secured, and that said last-mentioned mortgage or trust-deed "has, and of right ought to have, precedence to and priority over said trust-deed or mortgage to the said Janssen, and to all other liens and incumbrances whatsoever on the said Mineral Point railroad." The bill then charges that Keep fraudulently claimed to own thirty of the bonds described in the Schuyler mortgage, for $500 each, and alleges facts to show that the bonds were void, and that Keep's possession of them was tortious, but that he had commenced a suit in the circuit court for Iowa county to foreclose the mortgage to Schuyler, and to recover the amount of said thirty bonds; and had also obtained a judgment against said company in the circuit court for La Fayette county in this state, in October, 1858, and that McFarland, as sheriff of Iowa county, had levied an execution to make the amount of said judgment upon property of said railroad company, and that the lien of this judgment was "subsequent and subsidiary" to the mortgage of said *Martin* and *Coman*. The bill then proceeds: "In tender consideration whereof," etc., etc., "therefore, that the said *Mineral Point Railroad Com-*

*pany*, and the said Samuel D. Hastings, treasurer of the state of Wisconsin, successor in office to the said Edward H. Janssen, and the said George L. Schuyler and John M. Keep, may, upon their respective corporal oaths, full, true and perfect answers make," etc., etc. ; "that the said *Mineral Point Railroad Company* may be decreed to pay to your orators, in trust for the holders of the bonds," etc., etc., "and, in default thereof, that said defendants above named, and all persons claiming under them, or either of them, or otherwise, may be barred and foreclosed," etc., etc., "and that all and singular said mortgaged premises, with the appurtenances, may be sold," etc., etc., "and that some discreet and proper person may be appointed * * a receiver in this cause," etc., "and that said John M. Keep and Thomas McFarland, sheriff of said Iowa county, and their agents, attorneys and bailiffs, may be enjoined from selling" the property and franchises of the railroad under the judgment recovered by Keep in the La Fayette circuit court, and that said Keep, his agents, etc., may be enjoined from proceeding in his foreclosure suit in the Iowa county court until the further order of this court, and that said Keep, etc., may be further enjoined from disposing of said thirty bonds in his possession until the further order of the court, and that said Keep may be decreed to deliver said bonds up to be canceled, "and particularly that said defendants answer the interrogatories following [here follow sundry interrogatories]: May it please your honor, the premises being considered," etc. Here follows a prayer for an injunction against Keep, his agents, etc., and McFarland, his agents and bailiffs, restraining them as previously specified ; and for process against all the defendants.

The *Mineral Point Railroad Company* entered an appearance in the above-mentioned suit ; and service was had upon said Keep, and upon said Samuel D.

Hastings, treasurer of the state of Wisconsin, who transmitted the subpœna served upon him to the chairman of the board of supervisors of Iowa county, "and gave the officers of said county authority, by letter, to use his name in any proper way in defending said suit." Schuyler was not served with process, and did not appear. In February, 1861, the district court ordered that said bill of complaint be taken as confessed as to the *Mineral Point Railroad Company*, Samuel D. Hastings, treasurer of the state of Wisconsin, and John M. Keep, for their having failed to plead, answer or demur to the same ; and, after a reference for computation of the amount due, a decree of foreclosure and sale was rendered against said three defendants, which decree contained the following clause : "And it is further ordered, adjudged and decreed that the defendants, *The Mineral Point Railroad Company*, Samuel D. Hastings, treasurer of the state of Wisconsin, and John M. Keep, and all persons claiming or to claim under them, or either of them, since the commencement of this cause, be forever barred and foreclosed of and from all equity or equities of redemption, and claim of, in and to said mortgaged premises, property, franchises, income and effects, and every part and parcel thereof; and that the defendant, John M. Keep, has no right to thirty of the bonds secured by and included in the deed to George L. Schuyler, as ascertained by the bill of complaint in this cause, and that the said bonds are wholly void, and that the said John M. Keep deliver up the same to be canceled."

Under this decree, the mortgaged premises were sold in November, 1861, to *James C. Carter*, and the sale confirmed ; and the marshal's deed was duly executed and recorded. Thereupon *Carter* conveyed a portion of said railroad property to *Asahel Finch, Samuel P. Holmes, Henry Koop, George W. Cobb and Luther Beecher ;* and the six owners of the road, on the 12th of November, 1861, organized, under the laws of this

state, a new corporation, entitled "*The Mineral Point Railroad*," to which the railroad property was conveyed; and thereupon the said last-mentioned company took possession of the road, with all its property and franchises, and continued to use and operate the same until the commencement of the present action.

In 1866, the *Board of Supervisors of Iowa County* brought this action against the *Mineral Point Railroad Company, William E. Smith, treasurer of the state of Wisconsin, George L. Schuyler, David R. Martin, Lucien D. Coman, James C. Carter, Asahel Finch, Samuel P. Holmes, Henry Koop, George W. Cobb, Luther Beecher* and the *Mineral Point Railroad.* The complaint alleges that the $150,000 worth of bonds first executed, as above stated, and secured by the Janssen mortgage, had been delivered to plaintiff by the *Mineral Point Railroad Company*, and the same were still owned and held by plaintiff, and there was due and unpaid thereon the whole amount of interest which had accrued since the date of their issue; that payment of the same had been duly demanded and refused, and, by the terms of the mortgage, the principal of said bonds had thus become due, etc. ; and judgment is sought for the whole amount of principal and interest, and for a foreclosure of said Janssen mortgage, etc. The complaint also avers, *inter alia*, 1. That the mortgage or trust-deed to George L. Schuyler, above mentioned, "was and is the first mortgage" which the company was authorized, by sec. 2 of ch. 117, Local Laws of 1853 (above recited), to execute, and to which, by the terms of said act, and of the Janssen mortgage, said last-mentioned mortgage was to be "subject, subordinate and subsidiary," and that the Janssen mortgage constituted the first lien upon the property therein described, saving and excepting only said Schuyler mortgage. 2. That the *Mineral Point Railroad Company*, in March, 1854, delivered to R. & G. L. Schuyler the one thousand

bonds for $500 each, above described, and that said R. & G. L. Schuyler afterward sold and disposed of a large part of the same, and pledged, as collateral security for the private and individual indebtedness of said firm, or hypothecated, sixty of said bonds; and that all of said one thousand bonds, for a long time, and until they were taken up, canceled and discharged, remained a valid outstanding debt against said *Mineral Point Railroad Company*, secured by said Schuyler mortgage. 3. That, on the 1st of January, 1856, the entire amount of principal and interest of said one thousand bonds was fully paid, and the bonds satisfied, canceled and discharged by said *Mineral Point Railroad Company*; and that thereupon said Schuyler mortgage ceased to be an incumbrance or lien upon the estate therein described, and became of no further force, virtue or effect. 4. That the mortgage or trust-deed to *Martin* and *Coman*, above mentioned, was and is a *third* mortgage upon the property therein described, and that both the Schuyler and the Janssen mortgages were prior and superior liens thereto; and that said bonds and mortgage or trust-deed to *Martin* and *Coman* were executed, delivered and recorded, without the knowledge of plaintiff, or of the treasurer of the state of Wisconsin, and were in fraud of plaintiff's rights. 5. That plaintiff was not a party to the above-mentioned suit by *Martin* and *Coman*, upon said mortgage, and the bonds secured thereby, in the United States district court; that it had no notice of said suit, and did not appear therein; that the marshal's deed to *Carter* of the property sold in pursuance of the decree in said suit, and the deed of *Carter* to *Finch and others*, and the articles of association entered into between *Carter*, *Finch and others*, organizing the corporation known as the "*Mineral Point Railroad*," and the deed from *Carter*, *Finch and others* to said new corporation, were all made and executed without the knowledge of plaintiff, and were all in con-

travention of, and a fraud upon, his rights.   6. That the three hundred and forty bonds issued in April and July, 1856, and purporting to be secured by the Janssen mortgage, are not the bonds described in said mortgage, and are not a lien or incumbrance upon the property of the company, and were issued without plaintiff's knowledge or consent.

The defendants *Beecher*, *Koop*, *Cobb*, *Carter*, *Finch* and *Holmes*, *Martin*, *Coman* and the *Mineral Point Railroad* answered, 1. That plaintiff was estopped by the decree in the United States district court, in the suit of *Martin* and *Coman* above described, from denying that the Janssen mortgage was "subject and subordinate" to the *Martin* and *Coman* mortgage foreclosed in that suit, and from claiming any interest in the property covered by that mortgage, as against the purchasers at the mortgage sale, and those holding through or under them. 2. For a second defense it alleged, *inter alia*, that the *Mineral Point Railroad Company*, in November, 1861, ceased to exist, except for the purpose of suing and being sued, and, in November, 1864, ceased to have any corporate existence for any purpose ; that plaintiff was not, at the time of the commencement of this action, the owner or holder of, or in any way interested in, any of the bonds secured by the Janssen mortgage ; that the president of said *Mineral Point Railroad Company* was not authorized to enter into the written contract with R. & G. L. Schuyler for the construction of its road, nor to execute the Schuyler mortgage, nor was his action ratified by the company ; that George L. Schuyler never accepted the trust pretended to be created by said last-mentioned mortgage ; that, before any bonds had actually been made or delivered by said company, secured by said Schuyler mortgage, said firm of R. & G. L. Schuyler failed, made an assignment, etc., and the pretended contract and arrangement between the company and said firm was wholly abandoned by

the mutual consent of the company, the firm and the assignee, and neither party thereafter did any act or claimed any right under said contract, and the company never executed, disposed of, or delivered to any person any of the bonds described in said Schuyler mortgage, and so said mortgage never constituted any incumbrance on the property of the company; that, afterward, the company made a first mortgage on all its property to secure bonds not exceeding $10,000 per mile of the whole length of its road (under the power reserved to it by the Janssen mortgage and the act of the legislature), and thus completed the road and put it in operation, and this first mortgage was the one to *Martin* and *Coman* above mentioned.   A copy of one of the bonds secured by this mortgage is set out, and on the back of each was printed the words, "First Mortgage Convertible Bond of the Mineral Point Railroad Company."   It is further alleged that, in all the transactions of said company in the sale and disposition of the bonds secured by the *Martin* and *Coman* mortgage, and those secured by the Janssen mortgage, it was understood and believed by said company, and by those who received said bonds, that said *Martin* and *Coman* mortgage created a first lien upon the property of the company, and that the lien of the Janssen mortgage was "subordinate, subsidiary and inferior" thereto.   The answer then recites the proceedings in the United States district court upon the bill to foreclose the *Martin* and *Coman* mortgage; the decree, the sale to *Carter*, and the confirmation thereof, the conveyance by *Carter* to *Finch, Beecher and others*, the organization of the new owners into the "Mineral Point Railroad," and the entry of that corporation upon the property and franchises.   It further avers that said last-mentioned company, while operating said road and claiming to be the owner thereof, as plaintiff well knew, had expended over $15,000 in improvements and repairs upon the

property, in excess of the net -earnings arising therefrom, no part of which sum has the plaintiff ever offered to repay. It then denies all allegations of fraud in the complaint; alleges, in substance, that plaintiff was duly notified of the action in the United States district court to foreclose the *Martin* and *Coman* mortgage, and, upon consultation with counsel, had determined not to enter any appearance in the case, etc. It also avers, in substance, that the three hundred and forty bonds running to Charles Kuehn, treasurer, etc., issued by the railroad company in April and July, 1856, were issued under the Janssen mortgage, and secured by it in the same manner as the bonds delivered to plaintiff.

The circuit court held that the Janssen.mortgage was a valid, subsisting lien upon the property therein described for the amount of principal and interest due on the bonds issued ·to the plaintiff; that no other bonds were embraced in or secured by it; that said Janssen mortgage was a paramount lien to all mortgages subsequently executed by the company, including both the Schuyler and the *Martin* and *Coman* mortgages; and that the proceedings and decree in the United States district court in the suit to foreclose the *Martin* and *Coman* mortgage did not preclude plaintiff from maintaining this action, or impair his rights under the Janssen mortgage. A judgment of foreclosure and sale was rendered accordingly; from which the answering defendants appealed.

*Mat. H. Carpenter* and *M. M. Cothren* (with *C. I. Walker*, of counsel*), for appellants, contended, among other things, that plaintiff was estopped by the decree in the United States district court in the suit upon the

---

* Mr. Walker is a member of the Michigan bar, and filed a separate brief. The two elaborate briefs for the appellants, so far as they discuss the questions considered by the court, are here attempted to be condensed into one argument. The comments of counsel on the cases cited are, however, omitted. REP.

*Martin* and *Coman* mortgage. 1. The bondholders were bound by a decree against the trustee, as much as if they were made parties by name. *Shaw v. Norfolk R. R. Co.*, 5 Gray, 170; *Campbell v. Watson*, 8 Ohio, 500; *Winslow v. Minn. & Pacific R. R. Co.*, 4 Minn. 316; *Sturgis v. Knapp*, 31 Vt. 1; *New Jersey Co. v. Ames*, 1 Beasley, 509; *Willink v. The Morris Canal & Banking Co.*, 3 Green's Ch. 377; *Van Vechten v. Terry*, 2 Johns. Ch. 197; *Swift v. Stebbins*, 4 Stew. & Port. 447; *Manly v. Kidd*, 33 Miss. 146; *Miller v. R. & W. R. R. Co.*, 36 Vt. 452; *Adair v. River Co.*, 11 Ves. 444; *Giffard v. Hort*, 1 Sch. & Lef., 409; *Leigh v. Thomas*, 2 Ves. Sen. 312; *Joy v. Wirtz*, 1 Wash. C. C. 417; *Thompson v. Brown*, 4 Johns. Ch. 643; *Paxton v. Douglas*, 8 Ves. 520; *Ross v. Crary*, 1 Paige, 417, and notes; *Meux v. Maltby*, 2 Swanst. 277; *Good v. Blewitt*, 13 Ves. 397. 2. Samuel D. Hastings, the then treasurer of this state, who was made a party, was the trustee of the Janssen mortgage. Art. 6, sec. 3, of the constitution of this state provides that the powers and duties of the state treasurer "shall be such as shall be prescribed by law." Sec. 28, ch. 9, R. S. 1849, and sec. 40, ch. 10, R. S. 1858, after enumerating certain duties of the treasurer, also provide that "he shall perform all other duties imposed on him by law." The duties of trustee of this mortgage were imposed upon this officer under sec. 2, ch. 117, Local Laws of 1853. Where a suit is given by law in favor of or against an officer, the person holding the office at the time the suit is commenced is the proper party. *Clouney v. Foote*, 1 Hill (S. C.), 421. When a bond or mortgage is executed to A. B., governor, and his successors in office, the action must be maintained by the successor. *Governor, etc., v. Allen*, 8 Humph. 178; *Wiley v. Cannon*, id. 10; *Patrick v. Rucker*, 19 Ill. 428; *Morn v. Yell*, 3 Eng. (Ark.), 121. 3. Schuyler was not even a *proper* party to the suit in the district court, upon the facts stated in the bill; and

even if a proper, was not a necessary, party, since a perfect decree could be made between the other parties without affecting his interest. 2 Barb. Ch. Pr. 174; Story's Eq. Pl. 193; 1 Daniell's Ch. Pr. 262, and notes; *Eagle Fire Ins. Co. v. Lent*, 6 Paige, 635; *Holcomb v. Holcomb*, 2 Barb. S. C. 23; *Lee v. Parker*, 43 Barb. 613. Besides, an objection to the non-joinder of a necessary party must be taken by demurrer; or, if it does not appear on the face of the bill, by plea or answer; otherwise it is waived. Story's Eq. Pl. § 75; *Story v. Livingston*, 13 Pet. 375; *Stark v. Brown*, 12 Wis. 572; *Moore v. Cord*, 14 id. 213; *Cord v. Hirsch*, 17 id. 403. 4. If Schuyler was a citizen of the same state as the plaintiffs in that suit, and was not a necessary party, his joinder or non-joinder as defendant in the suit did not oust the court of jurisdiction, or prevent its making a decree against the other defendants. Act of Congress, Feb. 28, 1839 (5 U. S. Stat. at Large, p. 321); *Wormley v. Wormley*, 8 Wheat. 421; *Banks v. Carneal*, 10 id. 181; *Elmendorf v. Taylor*, id. 152; *Venable v. Bank of United States*, 2 Pet. 107; *Vattier v. Hinde*, 7 id. 252; *Story v. Livingston*, 13 id. 359; *Atkins v. Dick*, 14 id. 114. The non-joinder of a proper but not necessary party cannot be objected to for the first time at the hearing on appeal (*Alexandria v. Seton*, 1 Pet. 299); nor can the objection prevail at the hearing in the court below, if the decree can be made between the parties before the court, without affecting the interests of those not before it. *Story v. Livingston*, 13 Pet. 359. 5. But, even if Schuyler was a necessary party, this only rendered the decree erroneous, and not void, as between the parties before the court. *Mallow v. Hinde*, 12 Wheat. 198; *Houghton v. Kneeland*, 7 Wis. 244; *Green v. Dixon*, 9 id. 537; Brightly's Fed. Dig., p. 496, § 88. The court having had jurisdiction, the decree cannot be attacked collaterally, and is conclusive upon the parties and their privies.

1 Greenl. Ev. 522, 528; 2 Smith's L. C. 435; *Palmer v. Oakley*, 2 Doug. 433; *Prentiss v. Holbrook*, 2 Mich. 375, 376; *Voorhies v. Bank of United States*, 10 Pet. 449; *Huff v. Hutchinson*, 14 How. 588; *Gould v. Stanton*, 16 Conn. 20.     And, in particular, that this is true of a case where the bill was taken *pro confesso*, see 1 Dan. Ch. Pr. 577; 1 Barb. Ch. Pr. 372; *Wooster v. Woodhull*, 1 Johns. Ch. 538; *Ogilvie v. Herne*, 13 Ves. 563, and notes; *Robinson v. Townshend*, 3 Gill. & Johns. 224; *Williamson v. Probasco*, 4 Halst. Ch. 571. Where the record shows a proper cause for the decree, the latter cannot be attacked collaterally by controverting the facts stated. *Landes v. Brant*, 10 How. 348; *Erwin v. Lowry*, 7 id. 172.     And this conclusiveness relates to every point which was either expressly or *by necessary implication* in issue, and was decided, or must necessarily have been decided, in order to support the decree. *Bank of United States v. Beverly*, 1 How. 134; *Embury v. Conner*, 3 Comst. 522; *Doty v. Brown*, 4 id. 72; *Castle v. Noyes*, 14 N. Y. 329; *Campbell v. Ayres*, 1 Clark (Iowa), 258; *Shears v. Dusenbury*, 13 Gray, 292; *Parrish v. Ferris*, 2 Black, 606; *Town v. Lamphere*, 34 Vt. 365; *Church v. Chapin*, 35 id. 223; *Wright v. Butler*, 6 Wend. 284; *Van Pelt v. Kimball*, 18 Wis. 362; 1 Greenl. Ev. 434; 2 Smith's L. C. 594, 791, 795–797, 809, 810; and this entirely irrespective of the question whether it was properly or erroneously decided, or whether it was decided on the law or fact. *Hungerford v. Cushing*, 8 Wis. 324; *Falkner v. Guild*, 10 id. 563; *Tallman v. McCarty*, 11 id. 403.     6. The question of priority between mortgagees may be raised and determined in a foreclosure suit. *Clason v. Shepherd*, 6 Wis. 374, and 10 id. 356; *Hathaway v. Baldwin*, 17 id. 616; *Pelton v. Farmin*, 18 id. 222; *Palmer v. Yager*, 20 id. 91; *Tower v. White*, 10 Paige, 395; *Corning v. Smith*, 2 Seld. 84; *Freeman v. Schroeder*, 43 Barb. 618; *Frost v.*

*Koon*, 30 N. Y. 428. 7. The question of the priority of the *Martin* and *Coman* mortgage to the Janssen mortgage was fully presented in that suit; the state treasurer was made a party in express terms, as the trustee of the Janssen mortgage, and a decree sought against him distinctly, on the sole ground that said mortgage was subordinate to the one then in suit; and no such decree as that rendered could have been rendered against him, except upon that ground.

*Moses M. Strong*, for respondent, contended, among other things, 1. That the question whether the *Martin* and *Coman* mortgage created a lien paramount to the Janssen mortgage, was not *res adjudicata.* (1) Such priority is not properly *charged* in the bill. It charges as a matter of fact what was only a conclusion of law. The only facts charged affect only the Schuyler mortgage, and are not sufficient to invalidate that mortgage; but, if they did, *non constat* that the *Martin* and *Coman* mortgage is superior to that made to Janssen. (2) There is no *prayer* for a decree of the priority of the *Martin* and *Coman* mortgage, and in fact no prayer, except for process. 3. There is no *decree* of the priority of said mortgage. The decree does not even purport to foreclose Hastings in his character of trustee. In order that a decree of foreclosure should have any effect in postponing a prior mortgage, or one claimed to be prior, the bill should distinctly allege that a defendant named does claim to hold a mortgage of prior obligation and incumbrance on the land, and should also state the ground on which the plaintiff in the foreclosure suit claims it should be held subordinate to his mortgage, and should call upon such defendant to set forth the ground of his claim; and the decree should find the facts, and declare, as the legal result, that such mortgage is subordinate. *Lewis v. Smith*, 5 Seld. 502, 514, 515; *Strobe v. Downer*, 13 Wis. 10; *Straight v. Harris*, 14 id. 509; *Williamson v. Probasco*, 4 Halst. Ch. 571; *Perkins v. Walker*, 19

Vt. 404; *Gray v. Pingrey*, 17 id. 419. (3) The court could not adjudicate that the *Martin* and *Coman* mortgage was paramount to the Janssen mortgage, without invalidating that made to Schuyler. But, in order to such an adjudication, Schuyler was a necessary party. *Shields v. Barrow*, 17 How. 130. A decree adjudicating upon his rights would have defeated the jurisdiction of the court as to the other defendants, notwithstanding the act of congress of 1839. *Story v. Livingston*, 13 Pet. 359. 2. The county of Iowa was not a party to the *Martin* and *Coman* suit. Hastings, state treasurer at the time the suit was brought, was not the trustee. *Delaplaine v. Lewis*, 19 Wis. 476. Ch. 117, Local Laws of 1853, authorized the mortgage to be made to the treasurer and his successors, but did not assign to, or impose upon, the treasurer any duty. "Whether the bonds had been negotiated or not, the bondholders could hardly be considered as represented by the nominal grantee in the deed of trust, until after foreclosure, when the securities in a manner cease to be negotiable. *Pennock v. Cox*, 23 How. 117; *Sturges v. Knapp*, 31 Vt. 1. But, however that might be, where such grantee was selected with a view to his personal fitness for the office, and where, by consequence, there could be no question that the trust was express and personal, it could scarcely be claimed that a *mere official name*, like that of judge of probate, or treasurer of the state or county, in whose name official bonds are required to be taken in most of the states, could fairly be considered as representing the parties, and all the parties, for whose benefit such bonds are taken. And, when railway mortgages are allowed to be executed in the name of the treasurer of the state for mere form's sake (as such security must be made in the name of some one), it seems like carrying the idea of agency or trust farther than any case has assumed to go, to hold that such trust or agency is not personal, but official, and at the same time to hold that this mere offi-

cial relation will allow of the representation of all the parties in interest. It seems that the legal title would, in this case, vest in Edward H. Janssen, personally, and that the addition of his official designation is mere *descriptio personæ*. This has always been so held in regard to notes and bills, and other negotiable securities. *Johnson v. Catlin*, 27 Vt. 87, and cases there cited; *Bank of United States v. Lyman*, 20 id. 666. The rule as to contracts under seal is the same as in regard to negotiable paper. They can be sued only in the name of the obligee or grantee, so that, if any one in the office of state treasurer could be said to represent the interest of the present plaintiff, on the ground of the mortgage being made in his name, it must be Janssen, and not any of his successors in office."* Again, the county of Iowa was the sole *cestui que trust*. From their nature, the obligations of the railroad company received by the county in exchange for its own bonds must remain vested in the county. The obligation was a mere guaranty of indemnity, available only in behalf of the guarantee. It could not, therefore, be negotiated or transferred. The clause covenanting to transfer stock of the company in exchange for the obligation is as essential a part of it as the covenant to pay Janssen, or his successors, or the holder; yet this runs to the county alone, and not to any assignee of the county, or the holder of the obligation. And the bonds received by the plaintiff are the only ones ever issued which were secured by that mortgage—the three hundred and forty bonds subsequently issued, payable to Charles Kuehn, treasurer, etc., not being such as are contemplated by the law and the mortgage.

*Reese v. Mulks*, on the same side.

DIXON, C. J. This cause was most ably argued on both sides, and, if time permitted, it would be interest-

---

* These quotations are from an opinion by Hon. Isaac F. Redfield, obtained by the plaintiff in this action.

ing to pursue and consider many of the questions presented and so elaborately discussed by counsel. But time does not permit; and we can examine only such questions as arise and must be determined in disposing of the case upon a single principle of law, which we deem applicable to it, and which is decisive of the action. That principle is the principle of estoppel by judgment. We are unanimously of opinion that the decree of the district court of the United States for the district of Wisconsin, in the proceeding to foreclose the *Martin* and *Coman* mortgage, is conclusive upon the present plaintiffs, and forever debars them, as against the parties to that action who were served with process, and over whom the court acquired jurisdiction, and those claiming under such parties, from raising or litigating any of the questions upon which their right to maintain this action depends.    This is an action by the plaintiffs, as *cestui que trusts* and real parties in interest under the Janssen mortgage, to foreclose that mortgage, and to have the same, according to its date, declared a lien prior and paramount to the lien of the *Martin* and *Coman* mortgage.

This question of priority is the great question in the case, out of which arose the numerous other questions argued at the bar, which we shall not consider, since, as already stated, we think this and all of the questions connected with it are conclusively settled against the plaintiff by the decree of the district court in the foreclosure action above referred to.    Our examination will therefore be limited to the objections taken to the form and sufficiency of that decree, and of the proceedings in which it was rendered.

1. It is said that it was not charged in the bill, that the *Martin* and *Coman* mortgage was paramount — that in this respect the bill charged as matter of fact what was only a conclusion of law.    After pleading the act of March 23, 1853, by its title and the day of its passage,

and alleging that the Janssen mortgage was executed in accordance with its provisions, the bill proceeded to charge that that mortgage "was, according to the tenor thereof, subject, among others, to the reservations and conditions following, namely, that the said deed of trust or mortgage should be deemed taken, considered and held to be subject and subsidiary to another deed of conveyance of all the property, real, personal and mixed, therein mentioned, to be thereafter executed by the said *Mineral Point Railroad Company* to such other party as the said *Mineral Point Railroad Company* should elect, which should be called a first mortgage, and should constitute a first lien and incumbrance upon the said railroad of the said *Mineral Point Railroad Company*, and all of the property mentioned in the said mortgage or trust-deed to the aforesaid Edward H. Janssen, but which said first mortgage * * * should not be issued to secure the payment of bonds to a greater amount than ten thousand dollars per mile of the whole length of said road, nor bear interest at a rate greater than eight per cent. per annum, payable semi-annually." And, again, having alleged that it was the intention and understanding of all parties in interest in the Janssen mortgage, at the time of its execution and of the execution of the bonds secured by it, that it should be subject to another mortgage on said road for three hundred and twenty thousand dollars; that the controlling motive for executing the same was, that the railroad company might comply with the act of March 23, 1853; and that the object and intention of the county of Iowa, in exchanging its bonds with the railroad company, was to aid the company in the construction of the road by loaning the credit of the county to the company to the amount of $150,000, and to leave the resources of the company unimpaired for the purpose of completing the road, so that the company should have full and ample power to create a debt to the amount of $320,000,

the railroad being thirty-five miles in length, which debt, though created subsequently to the mortgage to Janssen, should take precedence of the same, the bill expressly charged the fact to be, "that the said mortgage or trust-deed to the said Edward H. Janssen, and the debt thereby intended to be secured, was and is subject and subsidiary to the mortgage or trust-deed aforesaid to your orators, and to the debt thereby intended to be secured ; and that the said mortgage or trust-deed to your orators has, and of right ought to have, precedence to and priority over the trust-deed or mortgage to the said Janssen, and to all other liens and imcumbrances whatsoever on said Mineral Point railroad." Upon these allegations, it seems clear to us that the objection is not well taken, and cannot be sustained. It may be that the pleading would have been more logical and accurate, and the issue presented more clearly defined, if the bill had charged that the orators' mortgage was executed under and in pursuance of the power reserved by the act of 1853, and by the mortgage to Janssen, and that, being so executed, it had precedence to and priority over the Janssen mortgage and all other liens whatsoever. But then, if such had been the form of pleading, it is not clear that it would not have been subject to the same objection now urged, for the averment that the mortgage was executed in pursuance of the reserved power seems quite as much a conclusion of law as that it constituted a lien prior and paramount to the lien of the other mortgages. Either form of pleading is liable to the criticisms of counsel, if such averments are to be regarded as altogether unauthorized. But they are not. They are regarded in law as averments of matters of fact, though involving, to some extent, what may in strictness be said to be conclusions of law. They belong to that class of mixed propositions of law and fact, which, for the purpose of pleading, are treated as facts, and examples of which are not unfrequent, especially

where the title or ownership of property is alleged. Any other rule would lead to the greatest prolixity and unnecessary particularity of statement, which the law does not require. It is enough that the opposite party is fully and fairly informed of the claim made against him, and of the grounds upon which it is asserted. Such was the pleading here ; and it is difficult to perceive how the defendants could have been benefited by any more minute statement of facts. A like objection was taken in *Gillett v. Robbins*, 12 Wis. 319, where the charge in the bill was, that the complainants were the heirs at law of a deceased person, to whom his real estate descended by the laws of descent. It was insisted that this was but the statement of a conclusion of law, and that the facts showing the complainants to be such heirs should have been pleaded. The objection was overruled, the court holding, that though the averment was in part of a conclusion of law to be deduced from several intermediate facts which must be established in evidence, still it was so much in the nature of a fact, and its statement in that form so fully apprised the opposite party of the foundation of the claim set up against him, that it was by the rules of pleading sufficient. The reasoning of that case applies with equal force to this, and renders further investigation on our part unnecessary.

2. It is also said that the charges of the bill, conceding them to have been sufficient as allegations of matter of fact, did not raise or put in issue the question of the priority of the *Martin* and *Coman* mortgage over the Janssen mortgage, nor of its priority over the mortgage executed to Schuyler, and, therefore, the decree is not *res adjudicata* upon those questions. In support of this objection we are referred to *Lewis v. Smith*, 9 N. Y. 502 ; *Strobe v. Downer*, 13 Wis. 10 ; *Straight v. Harris*, 14 id. 509, and *Williamson v. Probasco*, 4 Halst. Ch. 471. The pleadings under consideration in those cases differed so widely from those which we are

now considering, that comment or discrimination seems hardly to be required.  It would be sufficient to say that in none of them were there any allegations contesting, or tending to contest or impeach, the validity or priority of the claims sought to be barred by the judgments.  The question as to the effect of the judgments, in case there had been such allegations, though alluded to, was of course not decided; but it is fairly to be implied, from the language and reasoning of each opinion, that, if such allegations had been made, the judgments or decrees, though in the ordinary form in foreclosure actions, would have been conclusive.  In *Lewis v. Smith* the question was as to a widow's paramount right of dower.  She had been made a party to a bill to foreclose a subsequent mortgage, and a decree *pro confesso* rendered against her, where the only averment in the bill was the general one authorized by the old chancery rule, that she, with other defendants, had or claimed some interest in the mortgaged premises as subsequent purchaser or incumbrancer, or otherwise. The court held that the rule authorizing such averment was made and adopted with sole reference to such interests and incumbrances as were in fact subsequent and subject to the mortgage being foreclosed, and concerning which there was no claim in opposition; that the averment did not and could not raise the question of priority of right as between the plaintiff and any defendant actually having such priority; and, consequently, that the question had not been decided, and the decree was not conclusive.  It was furthermore said, in the course of the opinion, that, in the special case of a title to mortgaged premises, and a *bona fide* controversy as to priority between it and the mortgage, the complainant in the foreclosure bill must state the facts upon which the question arises, as he insists they exist, according to the rules of equity pleading which prevailed antecedently to the rule referred to.  In *Strobe v. Downer* there was

still less ground for insisting on the bar, for there the general averment that the interest of the defendant accrued subsequently to the mortgage being foreclosed, had been stricken out of the printed form of complaint, so that the complaint contained nothing whatever from which any intention to charge that the defendant's prior mortgage was subsequent or for any reason subject to that to the plaintiff, could be inferred. *Straight v. Harris* was in all respects like *Lewis v. Smith,* the complaint containing only the usual allegation to cut off subsequent claims, but not prior ones ; while in *Williamson v. Probasco* the priority of the first mortgage, the mortgagee being a party, was expressly stated in the bill. It will be readily seen, from this brief examination, that those cases bear no resemblance to the present, but that, on the contrary, the pleadings here contain the very allegations which were there held to be wanting in order to make the judgments conclusive. The issue of priority, with a sufficient statement of the facts out of which it arose, was distinctly made upon the face of the pleadings here presented, and this objection must be overruled.

3. But it is again said, that the question of priority, though presented and in form decided, is not one which a court of chancery can adjudicate in a proceeding to foreclose a mortgage. It is freely admitted that a foreclosure suit is not an appropriate proceeding in which to litigate the rights of a party claiming title to the mortgaged premises in hostility to the mortgagor, and that, if such rights be so litigated, and be determined upon pleadings and proofs, the decree will be erroneous, and will be reversed. *Roche v. Knight,* 21 Wis. 324 ; *Corning v. Smith,* 6 N. Y. 82. But whether, until reversed, such decree is *coram non judice* and void, so that it may be collaterally impeached, is quite another question. The conclusion would seem to follow, from all of the decisions, that it is not. But, be that as it may,

the question here presented is of an altogether different character. It is not whether a claim of title in hostility to the mortgagor may be litigated in a foreclosure suit, but whether different mortgagees, claiming under the same mortgagor, and not adversely to him, may, as between themselves, litigate and have tried and determined questions of priority arising as to the liens of their respective mortgages, in an action to foreclose one of the mortgages. It is purely a controversy between the mortgagees, and not one which at all involves the investigation of title paramount or adverse to that of the mortgagor. We feel very confident that such a question may be litigated in a foreclosure action, and that it is an appropriate proceeding in which to present it. It must either be tried in the action to foreclose, or else a separate action must be instituted for that purpose. The necessity or propriety of two actions in the same court between the same parties, to determine questions arising out of the same subject-matter, which questions may as well be heard and determined in one action, is not perceived, and the authorities do not require them. Beside the case of *Lewis v. Smith*, and others first above cited, which clearly sanction the practice, we refer to the case of *Palmer v. Yager* (20 Wis. 91), where the point was directly decided. And even Judge REDFIELD, in his opinion and argument for the plaintiffs in this action, concedes that; upon proper pleadings, the question of priority may be so litigated.

4. It is furthermore insisted that the priority of the *Martin* and *Coman* mortgage was not adjudged, because there was no such specific prayer, and no prayer for general relief. If the force or validity of the decree depended on the presence of such prayer in the bill, or if without it no decree could be rendered, then, undoubtedly, this objection would be fatal to the proceeding. The bill contained no prayer for general or special relief, but only the prayer for process according

to the established practice of the court of chancery. Farren's Bill in Chancery, 34, 38 ; Story's Eq. Pl. § 40, note 1, and § 44, note 1. But the want of such prayer was not a defect involving the power or jurisdiction of the court to render a decree. It was a defect in the form of the bill merely, of which advantage might have been taken by demurrer. Story's Eq. Pl. §§ 453, 454, 528 ; Mitford's Pl. 107, 108. Or it may be that the objection could have been taken at the hearing, and a decree refused ; or the court might have allowed an amendment, and directed a decree ; but in no event was it a defect going to the jurisdiction of the court. It was competent for the court to proceed to judgment upon the case made by the bill, without such prayer ; and though it may have been irregular to do so, still the decree is in all respects as valid and binding, when collaterally called in question, as if the relief granted by it had been formally prayed for in the bill. That such is the power of courts of equity is illustrated by those cases of bills for charities, and of bills on behalf of infants, where relief will be granted upon any matter arising upon the state of the case, though it be not particularly mentioned and insisted on, or prayed, by the bill. Story's Eq. Pl. § 40, note 2, and cases cited.

5. Another objection is, that the decree did not find the facts, and specifically adjudge as a legal result that the *Martin* and *Coman* mortgage was prior and paramount. The decree, with one unimportant exception, was in the usual form in foreclosure suits, and, among other things, " ordered, adjudged and decreed that the defendants, the *Mineral Point Railroad Company*, Samuel D. Hastings, treasurer of the state of Wisconsin, and John M. Keep, and all persons claiming or to claim from or under them, or either of them, since the commencement of this cause, be forever barred and foreclosed of and from all equity or equities of redemption, and claim of, in and to said mortgaged premises, prop-

erty, franchises, income and effects, and every part and parcel thereof." The inquiry therefore is, whether the decree in these words was sufficient to adjudicate and determine, as between the parties to the suit, the question of priority raised by the facts stated in the bill; or was it necessary that it should go further, and expressly find the facts, and declare, as the result, that the complainants' mortgage was prior and paramount? It is obvious, from an examination of the pleadings and decree, that the question of priority must have been considered, and the fact found and decided by the court in favor of the mortgage in suit; for otherwise no decree barring and foreclosing the defendants from all equity of redemption, and from all claim of, in or to the mortgaged premises, could have been rendered. The fact of such priority constituted, on the state of case made by the bill, the very foundation and only ground upon which the complainants' right to the relief granted could have been based; and it cannot be supposed that the relief was granted unless the fact was so found. Was it then necessary that such finding and adjudication should have been set forth at length in the decree, in order that the parties should be bound thereby? We know of no authority for this position; but, on the contrary, the rules universally applied in the construction both of decrees in equity and judgments at law, seem to be directly opposed to it. The decree is the response of the law to the facts charged in the pleadings; and to ascertain what those facts were and how they were decided, recourse must be had to the pleadings. It is interpreted by the pleadings, and is understood as necessarily affirming every fact requisite to its correctness and validity. It is therefore *res adjudicata*, and an estoppel, upon every such fact. In the language of the brief of counsel in this case, every point which has been, either expressly or by necessary implication, in issue, and has been decided, or which must necessarily have

been decided, in order to support the judgment or decree, is concluded. The correctness of this principle is so well established, and the authorities in support of it so numerous, that it seems to be unnecessary to add to the cases found in the briefs of counsel; but the following, among others in this state, show that the decisions here are in harmony with the current of adjudications elsewhere: *Wanzer v. Howland*, 10 Wis. 8; *Tallman v. McCarty*, 11 id. 40; *Driscoll v. Damp*, 16 id. 106; *Arnold v. Booth*, 14 id. 180; *Nash v. Church*, 10 id. 303; *Hungerford v. Cushing*, 8 id. 324; *State of Wisconsin v. Waupacca Bank*, 20 id. 640; *Pierce v. Kneeland*, 9 id. 23; *Borngesser v. Harrison*, 12 id. 544; *Van Pelt v. Kimball*, 18 id. 362; *Heath v. Frackleton*, 20 id. 320. And the case of *Emmons v. Dowe*, 2 id. 322, cited and relied upon by counsel for the plaintiffs, is not in conflict with the general rule. The pleadings and judgment there under consideration were in the action of replevin given by statute, which authorized the maintenance of the action by a person having a special property in the goods, or the temporary and present right of possession, as well as by the general owner. The declaration, in the form prescribed by the statute, was for unlawful detention, and the plea was *non detinet*, accompanied by a notice that the goods were the property of the defendant. The verdict for the plaintiffs, which was in the nature of a special verdict, found that the defendant unlawfully detained the goods, but was silent as to the issue of property in them tendered by the notice. The judgment was, that the plaintiffs have and retain the goods. The court held, and very correctly, that the judgment was not conclusive upon the question of title or property in the goods, in the first place, because there was no evidence in the record that that question had been passed upon; and, secondly, because it was not a question which must necessarily have been decided in order to support the judg-

ment or verdict. The mere right of possession alone being sufficient to sustain the action of the plaintiffs, and the verdict and judgment, the court would not extend the estoppel beyond that; but in so doing it was governed by the general principle, that, whatever was necessarily thus decided was conclusive, and that, in determining this, and the consequent effect of the judgment, reference must be had to the pleadings, and, where the trial was by jury, also to the verdict.

6. It is further objected, that the trust or agency of Edward H. Janssen in the mortgage executed and delivered to him was personal and not official, and did not devolve upon Samuel D. Hastings, his successor in office, who was treasurer of the state at the time the foreclosure suit was instituted and decree rendered. The mortgage recited that it was made in conformity with the provisions of the act of March 23, 1853, and was to "Edward H. Janssen, treasurer of the state of Wisconsin, and his successors in office, party of the second part." The act of March 23, 1853, provided that the mortgage should be executed and delivered "to the treasurer of the state and his successors in office, in trust for the use and benefit of the holders of any and all of said bonds." Under these circumstances, we cannot well see how it can be maintained that Samuel D. Hastings, upon his accession to the office, did not become the lawful trustee and true representative of the *cestui que trusts.* Unlike the case of *Delaplaine v. Lewis, Governor, etc.,* 19 Wis. 476, it was not a trust created by mere act of the parties in interest, but was one created by authority of a law of the state; and, if the law authorized and required the mortgage to be made to the state treasurer and his successors in office, then the trust was not merely personal, but one pertaining to the officer as such. It is clear to our minds that such was the intention of the legislature, and must have been the intention and understanding of the railroad

company and the other parties in interest under the mortgage.

7. A still further objection is, that it was not sufficient to make the trustee alone a party to the bill, but that the *cestui que trusts*, or holders of the bonds, were necessary parties, without whom there could be no decree affecting or barring their rights. The mortgage to Janssen was executed and delivered to secure the payment of one hundred and fifty bonds for the sum of one thousand dollars each, before then issued by the railroad company, and made payable to Janssen,·treasurer of the state, and his successors in office, or to the bearer thereof; and the same were so described in the mortgage, and also asbeing "transferable by general or special indorsement, or by delivery." Besides those bonds, the mortgage was likewise made to secure the payment "of such other bonds of a similar description" as should thereafter be executed, part of an issue of bonds which should not exceed, in the aggregate, ten thousand dollars per mile of the whole of the surveyed line of said railroad. The bill charged that bonds of such subsequent issue, amounting to the sum of one hundred and seventy thousand dollars, had been executed and put in circulation by the company; but to whom or when issued, the complainants were not informed. It thus appeared on the face of the bill, that the number of bonds secured by the mortgage, and then outstanding, was three hundred and twenty, which might have been in the hands of an equal number of different persons as the holders thereof. Now, the general rule in equity is undoubted, that, in suits affecting trusts, the parties beneficially interested must be made parties. But this rule is subject to several exceptions, which are as well established as the rule itself; one of which is, that whenever the parties in interest are, or, from the nature of the case, may be, so numerous that it would be difficult or impracticable to bring them all before the court, and their rights are such as may be fairly and fully repre-

sented and tried without joining them, the application of the rule will be dispensed with. *Shaw v. Railroad Company*, 5 Gray, 170; *Willink v. Morris Canal Co.*, 3 Green Ch. 377; *Van Vechten v. Terry*, 2 Johns. Ch. 197; *New Jersey Franklinite Co. v. Ames*, 1 Beasley, 507. In the case we are considering, the trustee was a proper person to represent and defend the interests of his *cestui que trusts;* and to have required the complainants, at their peril, to ascertain and bring in every person holding or beneficially interested in any one of the bonds, would have been to impose upon them a task most difficult, if not actually impossible, to be performed. It would have been almost equivalent to denying them the aid of the court in the enforcement or foreclosure of their mortgage. The holders of the bonds were not, therefore, necessary parties; and the proceedings and decree, without them, are as valid as if they had been brought in. The rule, or, rather, the exception, in cases of the kind, is correctly stated in the case last cited, where it is said that the *cestui que trusts* of a mortgagee are not necessary parties to a bill of foreclosure, whether such mortgage constitutes a prior or a subsequent incumbrance, or whether the mortgagee be complainant or defendant in the suit. A final decree, settling the rights of all parties to the controversy, may be made without bringing such *cestui que trusts* before the court.

But it is said that the county of Iowa ought notwithstanding to have been made a party, because it was apparent from the character of the bonds delivered to the county, constituting the whole of the first issue, that they were not negotiable, and therefore, as to them, that the county was and must have remained the sole *cestui que trust*. This argument is founded upon a stipulation in those bonds, by which it was agreed that the company should pay the principal and interest of each and every of the bonds issued by the county, promptly whenever the same should become due and payable,

and that the payment by the company of any such sum of principal or interest on any of the bonds issued by the county, should operate as a release and discharge of the company from the payment of the same amount of the principal and interest of the bonds of the company delivered to the county in exchange. The effect of this, it is said, was to convert the bonds of the company into mere bonds of indemnity in the possession of the county, and to destroy their negotiability. But the stipulation, or that part of it which provided that the payment by the company of any sum of the principal or interest of the county bonds should operate as payment of a like sum of the principal or interest of the bonds of the company, was omitted in the description of the bonds contained in the mortgage, and it is not denied that the bonds, as therein described, were negotiable. Under these circumstances, it is contended for the defendants, that it is immaterial to the question we are now considering whether the bonds were in fact negotiable ; that it is enough that they were so described in the mortgage, which description the plaintiffs cannot now be permitted to dispute. This position seems to us well taken. The complainants in the foreclosure suit were not parties or privies, but strangers, to the Janssen mortgage, with reference to which it became necessary for them, in the foreclosure of their own mortgage, to make certain allegations in their bill, and to bring in some person or persons as the proper party or parties defendant. In determining these questions, they were governed entirely by the record of the mortgage, to which alone they could look for information with respect to the nature, contents or effect of the bonds. The record of the mortgage was the means appointed by law for that purpose, while the bonds themselves, in the hands of individuals or corporations, were wholly inaccessible, except at the option of the parties holding them. The complainants were not, therefore, required

to go further, or to seek information other than that afforded by the record; and if, by mistake or otherwise, the bonds were misdescribed in the mortgage, and the record wrong, it was in the power of the *cestui que trusts*, or holders of the bonds, to have had the same corrected; and, not having done so, it is too late for them to raise the objection, as against strangers who, acting on the faith of such record, have incurred expenses and changed their position so that their rights would thereby be seriously and injuriously affected. If not responsible for the negligence or omission of their trustee in this particular, the *cestui que trusts* are clearly responsible for their own neglect. They knew the nature of the bonds, and must be supposed to have known the contents of the mortgage; and if these differed, and the difference was such as to have misled third persons entitled to act on the strength of the record, the error was one of which the *cestui que trusts* cannot now complain. They are estopped from denying or calling in question the correctness of the recitals or description contained in the mortgage.

8. The eighth and last objection which we shall consider is, that George L. Schuyler was a necessary party defendant, in the absence of whom the court acquired no jurisdiction to pronounce a decree which was valid and binding as against any person. In support of this objection, it is assumed and argued that the mortgage to Schuyler was or might have been the actual first mortgage executed in pursuance of the power reserved by the act of the legislature, and by the mortgage to Janssen; and, if this was so, then that the mortgage to *Martin* and *Coman*, instead of constituting a prior lien, was, in fact, subsequent and subject to the lien of both the other mortgages. To determine this question of priority as between the *Martin* and *Coman* and Schuyler mortgages, and the consequent priority of either over the Janssen mortgage, it is said that Schuyler was an indispen-

sable party, without whom nothing was or could have been decided which bound or concluded Schuyler or any of the parties in interest. The first part of this proposition is unquestionably correct. Schuyler is not estopped by the decree from asserting and maintaining, if he can, that his was the real first lien. But, because a party not served with process, and not before the court, may collaterally dispute the decree, and deny its validity, it does not, we think, follow that other parties, who were served, and over whose persons the court, in fact, acquired jurisdiction, may do the same thing; nor do we know of a decided case in which such a doctrine has been held. The force or efficacy of a decree, as between the parties before the court, does not depend upon the fact that there may be other persons, proper or necessary parties, who are not before it. The absence of such persons is not a defect involving the jurisdiction or power of the court over the parties who are present, or over the subject-matter of the suit, so far as those parties may be concerned. The court may, nevertheless, proceed to a decree, and such decree, though rendered in violation of the rules and practice of equity in such cases, is not void as between the parties to it. It is irregular, but not void. It binds the parties to it until set aside or reversed in some direct proceeding for that purpose. And the reason of this is obvious. Jurisdiction exists whenever there is a suit, the subject-matter of which is cognizable in a court of chancery, and parties are before the court whose rights in relation to such subject-matter the court may adjudicate; and the effect of such adjudication between the parties, until reversed or set aside, does not depend upon the fact that the power of the court may have been erroneously exercised in making it. If there be necessary parties wanting, whose absence may render the adjudication fruitless or ineffectual, because the rights of such parties cannot be determined, that may be good cause for arresting the proceedings or dismissing.

the suit, but it does not deprive the court of power to proceed. The question as to who may or may not be necessary or proper parties is, and always has been, in very many cases, a most difficult and perplexing one. It constitutes of itself a title in the law of equity jurisprudence, upon which great learning has been expended, without the ascertainment of any rule of general or universal application. Each case must still be determined, to a considerable extent, upon its own peculiar facts and circumstances; the object of all rules upon the subject being in accordance with the cherished principle in equity, that the adjudication may be as complete and conclusive as possible. If, in a doubtful case, the court should err in this respect, it would be a most extraordinary conclusion that it had lost all jurisdiction, and its decree was of no effect. And, if it would not be so in a doubtful case, then it can make no difference with the application of the principle that the question presented was a plain one and easy to be decided. The jurisdiction of the court cannot be determined by the magnitude of the error. Again, there is a class of cases in which the bringing in of additional parties may be said to rest in a great measure in the sound discretion of the court. Should the court abuse its discretion, and commit great error in such case, would that oust the jurisdiction? We say, clearly not. And so we might proceed to illustrate the proposition in various ways, but we deem it unnecessary. The rule to be gathered from all the authorities may, in few words, be stated to be, that in no case does the jurisdiction of the court over the subject-matter and parties properly before it depend, nor can it be made to depend, on the absence of other parties, however the right of such other parties may be complicated by the decree, or however necessary it may be that they should be brought in, in order that a complete and final determination of the controversy may be had. In some cases the non-joinder of parties is but matter of abatement, of

which advantage can only be taken by plea, answer or demurrer; in others, the objection may be taken at any stage of the action, or the court may itself refuse to decree; but, in all cases, it is matter of mere error, and not of jurisdiction, which may be corrected in the suit, but never out of it. It cannot be collaterally examined. Upon this subject, Judge STORY says: "If the proper parties are not made, the defendant may either demur to the bill, or take the objection by way of plea or answer; or (subject to the considerations above suggested), when the cause comes on to a hearing, he may object that the proper parties are wanting; or, the court itself may state the objection, and refuse to proceed to make a decree; or, if a decree is made, it may, for this very defect, be reversed on a rehearing, or on an appeal; or, if it be not reversed, *yet it will bind none but the parties to the suit, and those claiming under them.* So that all the evils of fruitless and inadequate litigation may sometimes be visited upon the successful party in the original suit, by leaving his title still open to future question and controversy." Eq. Pl. § 75. And so, in the case under consideration, the objection that Schuyler was a necessary party, not brought in, or who, under the peculiar organization of the courts of the United States, could not be, not having been taken in any of these modes, and the court having proceeded to a decree without him, that decree is as valid and binding upon the parties to it, and those claiming under them, as if no such objection existed, although the title acquired under it may be still open to controversy upon the question of priority claimed in behalf of the mortgage to him. But that is a question which can be raised by him alone, or by the parties whom he represents, and who were not joined in the suit. As between the parties to the suit, it is conclusively settled by the decree, that his was not the first lien.

We deem it unnecessary to refer particularly to the authorities cited by counsel for the plaintiffs upon this

point (13 Pet. 359, 376 ; 12 Wheat. 194), as they contain nothing in conflict with what is here decided.    But we do wish to refer to the case of *West v. Sanders*, 1 Marshall (Ky.), 110, as fully illustrating the power of the court of equity to dispense with the presence of even a *necessary* party in a case very like that we have been considering, and as showing that the absence of such party cannot be a jurisdictional defect, of which the parties before the court can subsequently take advantage for the purpose of defeating the decree.

It follows from these views, that the judgment of the circuit court must be reversed, and the cause remanded, with directions that it be dismissed.

*By the Court.*—Ordered accordingly.