Barnard *v*. Roane Iron Company.

BARNARD *v*. ROANE IRON COMPANY (two cases).

(*Knoxville.*    October 12th, 1886.)

1. VENDOR AND VENDEE. *Conditional sale. Construction of contract for reconveyance.*

Where a purchaser by executory contract, of all the iron ore in certain lands, thereafter to be conveyed, agrees at time of his purchase to test the ore before the end of the year, and if he decides that he cannot and will not mine or use the same, to reconvey it to the vendors, upon demand and repayment of the purchase-price with interest; he will not be compelled to reconvey upon such demand and tender of repayment by the vendors, after deed has been made and purchase-price paid, upon the allegation that the purchaser failed to make the stipulated test; he asserting that he can and will use and mine the ore when it is needed.

2. SAME. *Rescission. Parol evidence to show fraud.*

In a proceeding by a vendor to rescind a contract for the sale of land, on the ground of fraud, parol evidence of the fraudulent representations of the vendee made in negotiating the contract is admissible; the purpose of its admission being not to contradict or vary the terms of the contract, but to show that the vendor was entrapped into an agreement which he would not otherwise have made.

Case cited and approved: Finlay *v*. King's Lessee, 3 Pet., 382.

3. SAME. *Same.* *Fraud of agent.*

A principal, who accepts the benefit of a contract made on his behalf by his authorized agent, will be held responsible for the fraudulent representations of the agent, although made without authority.

Case cited and approved: Franklin *v.* Ezell, 1 Sneed, 496.

4. SAME. *Same.* *Misrepresentation.*

Where a party intentionally or by design *misrepresents a material fact, or produces a false impression,* in order to mislead another, or to obtain an undue advantage of him, in every such case there is a positive fraud in the fullest sense of the term.

5. SAME. *Same.* *Inadequacy of price.*

Inadequacy of price, if so gross as to shock the conscience, may furnish sufficient ground for vacating, in a court of equity, a contract for the sale of land, whether executed or executory.

Cited: Pom. Eq. Jur. (Vol. 2), Sections 926–928.

6. SAME. *Same.* *Speculative property.* *Laches.*

But when there is no satisfactory proof of fraud or of gross inadequacy of price, and there has been a delay of ten years wholly unaccounted for, rescission will not be granted, especially in cases where the subject matter of the contract is speculative property, liable to large and frequent fluctuations of price.

Cases cited and approved: Peck *v.* Bullard, 2 Hum., 41; Knuckolls *v.* Lee, 10 Hum., 577; Scott *v.* Johnson, 5 Heis., 636; Grymes *v.* Saunders, 93 U. S., 62.

---

FROM ROANE.

---

Appeal from Chancery Court of Roane County. May Term, 1885. W. B. STALEY, Ch.

L. A. GRATZ for Complainants.

SEVIER & WELCKER for Respondent.

Barnard *v.* Roane Iron Company.

FOLKES, J.   The complainants and their ancestor, Jonathan Barnard, were owners of certain lands in Roane County.

On the 14th day of June, 1872, they executed the following instrument:

"This agreement, made and entered into this, the 14th day of June, 1872, is for the following effect and purpose, to-wit: That whereas, we, the undersigned parties, being seized and possessed of certain lands, lying and being in the Ninth and Tenth Civil Districts of Roane County, on the waters of Riley Creek, upon which iron ore is known to exist, and being desirous that the same may be developed and worked, do hereby agree to sell to the Roane Iron Company all the iron ore, with all the rights—including timber, for mining purposes only—necessary to mine and convey the same from off said lands, on the following conditions: The lands are to be surveyed at the expense of the Roane Iron Company, and at their option, within six months, and the number of acres of ore-lands, marked out on said survey, upon each of said lands; and we further agree to deed and convey, upon the payment of the purchase-money, from ourselves, our heirs and assigns, to the Roane Iron Company, their heirs or assigns, all the ore in land marked out in said survey, for the sum and at the rate of two and fifty one-hundredths ($2.50) dollars per acre.

"Witness our hands and seals, this 14th day of June, 1872.

"Signed:

| | |
|---|---|
| "JOHN A. BARNARD, | [SEAL.] |
| "S. T. BLAIR, | [SEAL.] |
| "J. M. BARNARD, | [SEAL.] |
| "R. T. PRICE, | [SEAL.] |
| "WM. DEATHERIDGE, | [SEAL.] |
| his<br>"MARTIN M. ✕ HICKS,<br>mark. | [SEAL.] |
| "F. PICKEL, | [SEAL.] |
| "JONATHAN BARNARD. | [SEAL.] |

"Witness:

"W. E. MCELWEE,

"JOHN BLAIR,

"J. T. WILDER."

A few moments thereafter, on the same day, for reasons that will appear later on, Wilder, as the agent of defendant company, executed the following agreement:

"Know all men that I, J. T. Wilder, Superintendent of the Roane Iron Company, having this day contracted from certain parties named in an agreement here referred to, certain ore in lands on the waters of Riley's Creek, and I do hereby agree to test or try a part or portions of the same, at some convenient point or place thereon, before the expiration of the year 1873; and I do further agree that when said test shall have been made, if the Roane Iron Company decides that

they cannot or will not mine or use the same,
that the company aforesaid shall, upon the demand
of the parties aforesaid, and the payment of the
purchase - money, reconvey to the original parties
making such demand all the rights, immunities, or
title conveyed by the parties aforesaid to the Roane
Iron Company.

"This June 14th, 1873.

"Signed:                    ROANE IRON COMPANY,

"By J. T. WILDER, Supt.

"Witness: W. E. McELWEE."

The date is admitted to be a clerical error, and
it is agreed in the pleadings that it should be
1872. It is not controverted that these two papers
were made at the same time and place, and the
letter left with John Blair (at whose house the
meeting between Wilder and the signers of the
contract of sale took place) for safe - keeping, he
being a neighbor of the complainants.

On the 7th December, 1872, the complainants'
testator, Jonathan Barnard, in pursuance of the
agreement to convey, executed a conveyance to the
Roane Iron Company of the mineral interests in
forty-six acres at $2.50 per acre, acknowledging the
receipt of the consideration of $115. On the same
day Complainant J. M. Barnard, in consideration
of $22.57, and Complainant John A. Barnard and
wife, in consideration of $47.58, convey to the de-
fendant company the iron ore on their land, em-
braced in certain designated boundaries.

On the 17th day of April, 1883, the attorney
for the executors and heirs at law of Jonathan
Barnard made a tender of the purchase-money,
with interest, to the defendant company through
its president, and demanded a reconveyance of the
iron ore interest. The tender and demand was
made orally, and accompanied with a written de-
mand, as follows:

"*To the Roane Iron Company:*

"Demand is hereby made upon you to reconvey
to us the iron ore interest deeded to you by Jon-
athan Barnard and Sarah Barnard, by an instru-
ment in writing bearing date December 7th, 1872,
by reason of your failure to test or try a portion
of said ore in accordance with the obligation signed
by you on the 14th day of June, 1873, and for
your failure to mine or use the same; and also
for your failure to carry out the other, further,
and different conditions agreed to by you. And I
hereby tender you the sum of $115, principal, and
the further sum of $71.85, being the interest
thereon, the consideration paid by you to me for
said ore interest.

"KINGSTON, TENN., April 17, 1883."

Signed in the name of the heirs of Jonathan
Barnard by E. E. Young, attorney.

A substantially similar demand and tender was
made at the same time separately for John A.
Barnard and J. M. Barnard, which tender and de-
mand, being refused by the president of the com-

pany, these three bills were filed on the 19th of April, 1883.

In the bill filed by the executors and heirs of Jonathan Barnard, it is alleged that he died in 1875; "that at the time the deed was made he was a very old man, past eighty-three years of age, feeble in body, and while not deprived of mental faculties, yet they were considerably impaired and weakened, while defendant's agent and officer was an active, vigorous, and middle-aged man."

With this exception, the charges and allegations of the three bills are substantially the same. They charge that the deeds were procured by misrepresentation and fraud, in this: That the agent of defendant, who examined the land for ore, "was an educated man, well understanding the indications, outcroppings, and value of iron ore," while the complainants were plain farmers, understanding nothing about mineralogy;" that said agent represented that the ore in complainant's land was in a perpendicular vein, and consequently of little, or, at any rate, of greatly less value than if found in a horizontal vein; "that such representations were false, the ore being of 'great value,' worth thousands upon thousands of dollars."

The bill further charges, that in addition to the promises contained in the written agreement signed by Wilder for the company, of date June 14th, 1873 (1872), there was yet another condition not

expressed therein, which was an agreement to construct, within a period of three years, a line of railroad connecting the lands to be deeded to it with the Tennessee River, where the cars were to be transported by boat to Rockwood Landing, thence to be run upon the track of defendant's railroad, to Rockwood; that when completed, this railroad should "carry, free of charge" to complainants, all garden products and small articles usually shipped from a farm to the markets, and heavy grain for a very moderate charge."

The bill then charges in very glowing language the transcendent beauties of the picture painted by Wilder of the marvelous growth and development of the country that would follow the introduction of the railroad, and adds:

This "operated upon the minds of the parties agreeing to convey with greater force than any other consideration, and formed the chief inducement for entering into the agreement."

It is charged that the promise to build the railroad was to have been incorporated in the agreement signed by Wilder, and that complainant supposed, until a short time before filing the bills, that it was inserted therein.

They say that "ten years have elapsed since defendant bound itself to test and try the ore, determine whether or not it will work the ore; and seven years have gone by since the railroad was to have been finished, yet nothing whatever has been done to carry out any of the undertakings;

that they are forced to the conclusion, and they charge, that the *representations* of building a rail-road and developing the country were false, and designed merely to mislead complainants and induce them to part with a valuable property for a mere trifle.

They charge that "the real design of the defendants was to monopolize and accumulate all the iron ore within reasonable reach of its furnace at Rockwood, Roane County, Tenn., so as to prevent all possible competition, and, instead of developing the country, to drive out from competition all persons who might otherwise be attracted by the favorable conditions," etc.

The prayer is that "the deed of December 7th, 1872, be declared fraudulent, null, and void, and that the same be rescinded and the title to the iron ore, and other privileges therein granted, be restored to complainants;" and that in the meantime the defendant be enjoined from conveying or incumbering said property, and for general relief.

To these bills a demurrer was interposed upon several grounds, amongst others, the statutes of limitation of one year, three years, and six years. The demurrers were overruled with leave to rely on the same in answer, and need not be further noticed. Answers were filed denying all fraud and all misrepresentation, meeting all such charges with specific denials. In addition to the denial of any promises to build a railroad, the authority of said Wilder and McElwee *to bind* the company by any

such representations or promises, if any were made, is denied. The authority of Wilder to bind them by the contract to reconvey was also denied; but, if bound thereby, they say they did make the test and did determine that they *could* and *would* use the ore, and, in consequence of such test and of such determination, they did, on the 7th of December following the making of such contract, signify their determination in the premises by completing the purchase, demanding and receiving deeds from complainants, and paying therefor in pursuance of the terms of the contract of June 14th, 1872.

Proof being taken, the causes were consolidated, and heard together, by consent.

The Chancellor adjudged the conveyances invalid, and void for fraud, and that they be set aside, and canceled, and this, too, without any return of the purchase-money.

The failure to decree a return of the purchase-money is, however, admitted by counsel for complainants to be erroneous, and is said to have been the result of inadvertence.

We concur, in the main, with the conclusions of law announced by the learned Chancellor who decided the case below. It cannot be denied that the fraud of an authorized agent will avoid a contract entered into by him on behalf of his principal, although the misrepresentation may have been unauthorized; the principal cannot make the contract his own, by availing himself of its benefits, and at the same time, avoid being responsi-

ble for the fraud upon which it is based. *Franklin* v. *Ezell*, 1 Sneed, 497.

It may also be admitted, that inadequacy of price, where it is so gross as to shock the conscience, may furnish sufficient ground for vacating a conveyance, in equity, whether executed or executory. Pom. Eq. Jur., Sections 926–8.

It is likewise true, that, where a party intentionally, or by design, *misrepresents a material fact, or produces a false impression* in order to mislead another, or to obtain an undue advantage of him, in every such case there is a positive fraud in the fullest sense of the term.

Nor can it be maintained that the evidence of the fraudulent representations is to be excluded, upon the doctrine that all representations are merged in the writing, subsequently executed by the parties. This rule has no application, when a suit is brought to be relieved against a written instrument, on the ground of fraud; the purpose is not to contradict, or vary the terms of the written agreement; but relief is sought upon the ground that by false representations, the parties are entrapped into an agreement which they would not otherwise have made. It is not denying the deed, nor its terms, to insist that it is vitiated by fraud. 3 Peters, 382.

With these propositions of law, resolved in favor of complainants, come we now to consider, what measure of relief they are entitled to receive, under the facts, as disclosed in this record.

It would be tedious, and unprofitable, to quote the language of the many witnesses examined in these causes; it must suffice to say that a careful analysis of the testimony, fails to sustain the liberal charges of fraud, in the bills contained, in any material particular.

It is true, that two of the Barnards say that the railroad was promised, and that it was the *main inducement* to their executing the contract; and that they demanded that. it be inserted in the paper, and Wilder told McElwee to insert it, and that McElwee read the paper, as though it had been incorporated in it. Several of the parties who were present at the time the contract was entered into, deny that any such promises were made, and deny that Wilder or McElwee assumed to insert such a clause in the contract.

These witnesses, who sustain Wilder and Mc-Elwee, in their positive denial, were called to testify by complainants; they were friends and neighbors of complainants, and presumably disposed to favor them.

It is incredible that such promises were made, and were acted on by complainants, as their main inducement .to the trade. . They say that the railroad was to have been built in three, or, at most, in five years, yet they allow ten years to elapse before they make complaint, or demand, of defendant company. The paper in which they say they supposed the promise had been written, they knew was, by Wilder, left in the possession of

Esquire Blair, their neighbor and friend, and yet never asked to inspect it, although, several years afterward, they were told by Blair, that he did not think any reference was made to the railroad in it, and invited them to come to his house and inspect it.

What was said with reference to the railroad, as we gather from the proof, is that, in response to inquiry as to how the ore would be transported, Wilder told them that it would be by rail to the river, and thence by boat, connecting with the railroad of the defendant on the other side. And we doubt not but that Wilder did descant, perhaps in glowing terms, upon the advantages to follow upon the introduction of a railroad into that country. The complainants lived in the neighborhood, they knew the railroad was not being built, yet they murmured not. Moreover, in 1879, Complainants J. A. and J. M. Barnard, as executors of their deceased father, Jonathan Barnard, sold the fee in the lands of which the iron ore had been sold to the defendant company to one W. D. Baywell and wife; and in their deed to Baywell they make the following reservation: "With the exception of the iron ore, which is deeded to the Roane Iron Company, with timber for beaming purposes, and ways to it, which was deeded by the said Jonathan Barnard in his life-time."

If short of an estoppel, it is certainly persuasive evidence of an acquiescence as late as 1879, so far as their father's lands were concerned.

As to the inadequacy of price, it is true that one witness is produced who says that the lands. are worth $1,000 per acre, and says he is a mineralogist, and undertakes to speak as an expert; but, without questioning his good faith, we regard his evidence as unreliable, as theoretic, and speculative.

Another witness called by complainants says the iron ore land he regards as now worth from $60 to $120 per acre; but he does not say what they were worth in 1872 and 1873. He says he has lately bought a half interest in 200 acres of ore lands within two and one-half miles of the land in question for $300, which is at the rate of $3 per acre. He further shows that such lands are worth more now than they were in 1873; so that we fail to find such inadequacy, if any, as would supplement the other proof of fraud claimed by the complainants.

We fail to find any satisfactory proof of misrepresentation as to the kind or character of iron ore which Wilder was undertaking to purchase.

We find nothing in the paper executed by Wilder on the day the title bond was executed which justifies the contention of complainant that it empowers them to now demand a reconveyance of the property because of the non-user of the mine. The language is, with reference to the reconveyance, as follows: "If the Roane Iron Company decides that they *cannot* or *will not* mine or use the same," etc.

The response of the defendant is that they *can* and *will* mine and use the same when they need it, of which they are to be the judge.

But if there was any doubt as to our conclusions on the facts of the case, it is difficult to see how the complainants could obtain relief after their long acquiescence with no satisfactory explanation of the delay. In the language of Judge Turley, in the case of *Peck* v. *Bullard*, 2 Hum., 41, "the proof is not satisfactory as to the existence of a fraudulent intent on the part of the defendant; but if it were, we are of opinion that the great length of time complainant has slept upon his rights precludes him from now asking the aid of a court of chancery." To the same effect see *Knuckolls* v. *Lea*, 10 Hum., 577; *Scott* v. *Johnson*, 5 Heis., 636.

This doctrine is particularly applicable to speculative property like that here in question, which is liable to large and frequent fluctuations in price. *Grimes* v. *Saunders*, 93 U. S., 62. The peace and repose of society require the enforcement of this rule, and it is not to be relaxed except in very extreme cases, and where the delay is satisfactorily accounted for.

The decree of the Chancellor will be reversed, and bills dismissed at the cost of the complainants in the respective causes.