MEMPHIS CITY BANK *v.* W. J. SMITH *et al.*

(*Jackson.*   April Term, 1903.)

1. FRAUD. A bank is affected with its president's knowledge
where it takes the benefit of his fraud in a contract.

Where a bank held all the shares of stock, representing the entire
capital stock of a corporation, as collateral security, pledged to
it to secure an indebtedness by the owner thereof, and sold the
same to enforce the collection of its debts, with an agreement
with the owner, that the bank would buy said property at the
sale, and sell it to the owner at the sale price, made by the
president of the bank who owned a controlling interest in the
stock of the bank, and was actively engaged in the management
of its affairs, and in fact controlled its acts and contracts as
he saw proper, and purporting to act in the capacity of presi-
dent of the bank, in making such agreement with the owner of
such pledged collateral security, at which sale the bank became
the purchaser of said property, and when the owner sought to
appropriate the benefits of the agreement, upon which he had
relied and acted, the president repudiated the contract and as-
serted the bank's ownership of the property, the legal result is
that the president's knowledge in respect to the agreement be-
came the knowledge of the bank, and thus having knowledge of
the president's fraud, and buying the property and keeping it
with that knowledge, the bank became a party to the fraud and
responsible therefor.   (*Post, pp.* 341-345.)

Cases cited and approved:   Bank v. Campbell, 4 Hum., 395;
Franklin v. Ezell, 1 Sneed, 497, 500; Tagg v. Bank, 9 Heisk., 479;
Winslow v. Harriman Iron Company (Tenn. Ch. App.), 42 S.
W., 698; Barnard v. Iron Company, 85 Tenn., 139, 148, 149.

110 Tenn—22

2. **SAME. Same. Charge to jury as to the authority of the bank president, and ratification by bank's acceptance of benefits of his contract.**

Where, in an action against a bank for conversion of certain pledged property worth fifty thousand dollars, which was purchased by the bank for thirty-one thousand and seven hundred dollars, under the agreement as stated in the foregoing head-note, it is proper for the court to charge the jury that it was without the general scope of the bank president's authority to make such an agreement, and unless the authority by the bank to the president to make the same or the bank's acceptance of the benefit of the agreement is shown, the contract would not be binding on the bank. (*Post, pp.* 342-346.)

Cases cited and approved: Bank v. Campbell, 4 Hum., 394; Franklin v. Ezell, 1 Sneed, 497, 500; Tagg v. Bank, 9 Heisk., 479; Winslow v. Harriman Iron Company (Tenn. Ch. App.), 42 S. W., 698; Barnard v. Iron Company, 85 Tenn., 139, 148, 149.

3. **SAME. Same. Same. Fraud is not obviated because the owner owed the bank more than the value of the property.**

Where, under such agreement as stated in the foregoing head-notes the bank got property worth fifty thousand dollars for the sum of thirty one thousand and seven hundred dollars, it could not obviate such fraud as harmless on the ground that it was not benefited by the purchase, and likewise the owner was not injured because the bank could have continued to bid up to the full amount of the debt which was more than fifty-nine thousand dollars, and would have gotten the property in any event, where the bank still retained against such owner and debtor the balance of the indebtedness, for which the securities had been deposited after deducting the thirty-one thousand and seven hundred dollars. (*Post, pp.* 345-346.)

4. **CONVERSION. Holding property as security for debts for which it was not pledged is a conversion.**

Where property is pledged to a bank as security for debts, and the bank asserts the right to hold the property as security for

Bank v. Smith.

other debts, for which it had not been pledged, and refuses to deliver it up except upon payment of those other debts, it is an unwarrantable assumption of authority over the property, and amounts to a conversion. (*Post, pp.* 346-356 and especially 354-355.)

Cases cited and approved: Gillett v: Bank of America, 160 N. Y., 549-559; Adams v. Clark, 9 Cush., 215.

5. **TENDER.** Actual not necessary where creditor demands more than he is entitled to, when.

Where the pledgee asserts a right to hold the property pledged as security for debts for which it had not been pledged, and for which it was not liable, and refuses to deliver it up except on payment of those debts, actual tender of the amount of the debt secured by the pledge is not necessary, if the debtor is ready, willing and able to pay such debt. (*Post, pp.* 346-357 and especially 355-357.)

Cases cited and approved: Ball v. Stanley, 5 Yerg., 199; Pearson v. Douglas, 1 Bax., 151; Bradford v. Foster, 87 Tenn., 11; Rogers v. Tindall, 99 Tenn., 356-363; Lamar v. Sheppard, 84 Ga., 561; United States v. Lee, 106 U. S. 196, 202; Ratcliff v. Vance, 2 Mill Const. (S. C.), 239.

6. **RES ADJUDICATA.** Suits must be between same parties in same capacity or character, and about same subject-matter.

In order that a judgment may be effective as *res adjudicata*, it is essential that the party sought to be precluded thereby should have sued or been sued in both cases, in the same capacity or character, and to enforce the same right, and it must appear not only that the subject-matter of the two suits is the same, but that the proceedings were for the same object and purpose, the same point being directly in issue. (*Post, pp.* 357-364 and especially 362-363.)

Cases cited and approved: Estill v. Taul, 2 Yerg., 467; Nicely v. Boyles, 4 Humph., 177; McKissick v. McKissick, 6 Humph., 75; Hurst v. Means, 2 Sneed, 546; Swaggerty v. Neilson, 8 Bax.,

32; Walker v. Day, 8 Bax., 77; Railroad v. Adkins, 2 Lea, 248; Shannon v. Woollard, 12 Lea, 663; Coulter v. Davis, 13 Lea, 451; Melton v. Pace, 103 Tenn., 484; Knight v. Atkisson, 2 Tenn. Ch., 284.

7. **SAME. Same. Case in judgment.**

In a former action by the pledgee against the indorser of certain notes, the indorser pleaded that the notes had been secured by property, which the pledgee had sold, worth more than twice the value of the notes, and that before the sale the indorser tendered the pledgee the amount due on the notes, and demanded release of the security which the pledgee refused, but the indorser, by express averment, declined to litigate the validity of such sale, insisting that according to the pledgee's own contention, the sum for which said property was sold had not been correctly credited. A cross bill was filed in said former suit by the indorser, to which the pledgee and principal debtor were made parties to recover usury charged by the pledgee. A judgment was rendered against the indorser for the balance due on the notes after deducting the usury, and the proceeds of the sale of the property.

*Held*: that such judgment was not *res adjudicata* in subsequent action by the indorser and principal debtor, as partners and pledgeors, against the pledgee to recover as upon an implied assumpsit the value of the pledged property, on the ground that the same had been converted by the pledgee, the tort being waived. (*Post, pp.* 357-364.)

FROM SHELBY.

Bank v. Smith.

Appeal in error from the Circuit Court of Shelby County.—L. H. ESTES, Judge.

THOMAS M. SCRUGGS, T. B. TURLEY and M. G. EVANS, for Bank.

MALONE & MALONE AND T. K. RIDDICK, for Smith et al.

———

MR. JUSTICE NEIL delivered the opinion of the Court.

The declaration alleges, in substance, that the defendant below (plaintiff in error here) had converted certain property belonging to the plaintiffs below, consisting of the following, viz.: Many lists, files, maps, plats, and books of reference, containing an abstract or history of all real estate titles, tax liens, and judgments in Shelby county, from which were prepared and sold abstracts of title to the public, and from which the plaintiff derived great gains and profits; also 370 shares of stock, being the entire capital stock in a Tennessee corporation known as the Memphis & Shelby County Abstract Company; that the value of the property so converted was $50,000; and that the plaintiffs, waiving the tort, were entitled to recover of the defendant, as upon an implied assumpsit, the aforesaid value.

The defendant pleaded *non assumpsit, res adjudicata,* and also a general plea of not guilty.

There was a verdict in the court below for $23,875.40, on which judgment was rendered.

The plaintiff in error has appealed and assigned errors.

The first error assigned is that the circuit judge declined to give in charge to the jury the following instruction, which the defendant below (plaintiff in error here) requested should be given, viz.: "Proof has been introduced in this court—the probative force of which, however, I do not undertake to determine—tending to show that some time in the early part of 1897, prior to March 13th, Thomas Barrett agreed with W. J. Smith that he would purchase the properties called the 'abstract properties,' then advertised for sale March 13, 1897, and that he would resell the same to W. J. Smith for the price bid therefor. If you find this to be a fact, I charge you that this agreement would impose no liability upon the defendant bank, of which Thomas Barrett was president, unless you are satisfied from the proof that Thomas Barrett was authorized by the bank to make such an agreement. It is without the scope of the general authority of a bank president to make such agreement, and, unless the plaintiff show authority from the bank to Barrett to make the same, the contract in this respect would not be binding on the bank, and would impose no liability upon it. The liability, if any, would be his personal liability, and not that of the bank. In the absence of authority the president of a bank cannot dispose of the cash or credits of the bank, and he not, by virtue of his office, surrender or release claims of the bank against any one. I charge you that, if you

Bank v. Smith.

should find that such an agreement was had, it was without the general scope of the powers of the president of the bank, and, in order to make it valid and binding upon the bank, the plaintiff must show authority therefor."

The circuit judge did not give this in charge to the jury as it stands above, but did give it after making the following additions, viz.:  He changed the third sentence so as to read:  "It is without the general scope of the general authority of a bank president to make such agreement, and unless the plaintiff show authorization by the bank to Barrett to make the same, or the bank accepted the benefit of the agreement as made by Mr. Barrett, the contract in this respect would not be binding on the bank, and would impose no liability upon it, except as before stated."

He also added at the close of the instruction, immediately following "therefor," the following clause: "or that the bank acted upon or got the benefit of the agreement as made by Barrett."

After thus modifying the instruction, his honor gave it in charge.

No objection is made to the first alteration, further than this necessarily, of course, is implied in the first assignment, to the effect that the instruction was not given as handed in, unaltered.  Specific objection, however, is made to the second alteration, and that is made the third assignment of error.

The first and third assignments we shall consider together.

There was testimony tending to show that Thomas Barrett was president of the bank, and as such

was actively engaged in the management of its affairs; that he owned, in his own right, a controlling interest in the stock of the corporation; and that in fact he controlled its acts and contracts as he saw proper.

There was also evidence tending to show that, in making the arrangement with defendant in error Smith, he purported to act in the capacity of president of the bank, or at least that Smith was warranted in believing that he was acting in that capacity; that is, so warranted from the conduct of Barrett and the surroundings of the parties at the time. There was also evidence tending to show that at the sale the property was bid off by the bank; that it subsequently claimed the property as its own, and sold it as such owner. There was also evidence tending to show that, although Smith was present at the sale, he made no bid, because he relied upon the agreement which he had made with the bank's president, Mr. Barrett. There was also evidence tending to show that, within a very short time after the sale, Smith called at the bank for the purpose of appropriating the benefits of the agreement, but that, upon this fact being made known to Mr. Barrett, he, as president of the bank, repudiated the agreement, and, as such president, asserted the bank's ownership of the property, and offered to sell it to Smith only on the condition that he would pay more for it than any one else. There was evidence also tending to show that the property brought at the sale so made only the sum of $31,700, and that it was worth $50,000.

The legal results to be deduced from the facts, so far as necessary to be stated here, are these: All of Mr. Barrett's knowledge in respect of the agreement be-

came the knowledge of the bank. *Tagg* v. *Tennessee National Bank,* 9 Heis., 479; *Union Bank* v. *Campbell,* 4 Humph., 394; *Winslow* v. *Harriman Iron Co.* (Tenn. Ch. App.), 42 S. W., 698. Thus having knowledge of Mr. Barrett's fraud, and buying the property and keeping it with that knowledge, the bank became a party to the fraud, and responsible therefor. *Franklin* v. *Ezell,* 1 Sneed, 497, 500; *Barnard* v. *Roan Iron Co.,* 85 Tenn., 139, 148, 149, 2 S. W., 21. And further, by so buying the property and keeping it, the bank may be said to have "acted upon" or to have taken "the benefit of the agreement as made by Mr. Barrett;" that is, that the bank was enabled to reap the result of the fraud which Barrett practiced upon Smith under the deceptive guise of the agreement, whereby Smith was thrown off his guard, and so deprived of the property.

In view of these facts, and the true legal interpretation of them as given above, it is perceived that the circuit judge was not in error in modifying the instruction offered, in the manner in which he did modify it.

There being testimony tending to show the facts referred to, it also follows that the circuit judge was not bound to give the instruction without taking note of them, because to have done so could not have failed to mislead the jury by drawing their attention away from the real case presented by the evidence. The instruction as offered was largely an abstraction. As given, it was brought close to the real case.

It is said that if there was any fraud it was harm-

less, because the bank was not benefited by the purchase, and likewise the defendants in error were not injured, in view of the large debts which they (Smith and Eaton) owed the bank, because, it is said, the bank could have continued to bid up to the full amount of the debt, more than $59,000, and would have gotten the property in any event. We think this consideration is beside the question. Assuming the facts previously stated to be true, then the bank got property worth $50,000 for the sum of $31,700, and still retained against defendant in error the balance of the indebtedness for which the securities had been deposited, such balance being a large sum.

For the reasons given, we are of the opinion that the first and third assignments should be overruled.

The second assignment of error is based upon the refusal of the circuit judge to give in charge to the jury, unchanged, the following instruction submitted by the plaintiff in error, viz.: "The conversion of the property of another is the appropriation of it to one's own use, or its destruction, or exercising dominion over it, in exclusion and in defiance of the owner's rights.

"If you find that on January 5, 1895, the plaintiffs in this cause borrowed from the Memphis City Bank the sum of $16,100, and deposited as collateral security with said note 260 shares of the Memphis & Shelby County Abstract Company, and also certain properties set out in the trust deed of that date, which has been read to you; that in January 15, 1896, the plaintiffs borrowed the further sum of $5,100 from the Memphis National Bank,

and deposited with said note, as collateral thereto, cer-
tain certificates of stock in the Memphis & Shelby
County Abtsract Company, which are set out in the face
of said note, which was read to you, which said note was
by agreement taken up by the Memphis City Bank; and
that later said indebtedness was extended by agreement
to February 1, 1897, which said agreement has been read
to you in evidence—I charge you as a matter of law,
that there could be no conversion on the part of the de-
fendant bank of the properties so pledged, in the sale
thereof according to the terms of said instrument under
which they were pledged; that under the terms of said
note for $16,100, dated January 9, 1895, the collateral
pledged, was applicable to the payment of said note, and
any surplus remaining was applicable to the payment
of any other note or claim held by the bank against
plaintiffs Smith and Eaton, whether matured or not;
that under the terms of said note the bank had the right,
upon its nonpayment at maturity, to sell said collat-
eral; and that a sale thereof would be no conversion.

"I further charge you that the properties pledged by the
instrument dated January 9, 1895, being a trust deed by
L. B. Eaton and W. J. Smith to James Frost, trustee,
are also applicable to the payment of said note of
$16,100, and upon the nonpayment of said debt, with in-
terest, at maturity, the bank had the right to have the
properties pledged therein to be sold, and the proceeds
thereof applied first to the costs of such sale, then to
the payment of said note for $16,100; and that, if it did

so, such sale would be no conversion. I further charge you that upon the nonpayment of said note for $5,100 according to the terms of said agreement, commonly called the 'extension agreement,' and which has been read to you, the defendant, of right, was entitled to sell the certificates of stock pledged in said note, together with two other certificates mentioned in said extension agreement, and apply the proceeds thereof to the payment primarily of said note of $5,100, and the excess that should be realized to the payment of any debt due to the Memphis City Bank by L. B. Eaton and W. J. Smith; that according to the terms of said agreement and of said note of January 9, 1895, for $16,100, the collaterals therein mentioned were liable not only for the specific debts set out, but for any debt due the bank by L. B. Eaton and W. J. Smith; the language of said extension agreement in this respect being as follows: 'The said L. B. Eaton and W. J. Smith, in further consideration of said extension, hereby pledge to said Memphis City Bank 110 shares of the capital stock of the Memphis & Shelby County Abstract Co. The certificate for two shares, being No. 40, is now delivered to said bank, and the certificates for 108 shares, being numbers 52, 53, 54, 55, and 44, held by the Memphis National Bank to secure a loan of $5,000; and the said Memphis City Bank may at any time take up said loan at the Memphis National bank and receive said certificates, so pledged to the Memphis National Bank, and hold the same subject to this agreement. Upon the nonpayment of said

notes by the said L. B. Eaton, which are set out in said extension agreement, or any of them, or any part of them, or any one of them, with interest thereon, on February 1, 1897, the said Memphis City Bank may sell at public sale said 110 shares of Memphis and Shelby County Abstract Co. stock, and apply the proceeds of such sale, first to all costs thereof including all commissions and attorney's fees; second, to reimburse itself for the expense of taking up said certificates and paying off the debts for which they are pledged to the Memphis National Bank; third, to the payment of the notes above set out, made by L. B. Eaton and indorsed by W. J. Smith, for the payment of which the said 110 shares of Abstract Co. stock are here pledged.' "I charge you, as a matter of law, that said W. J. Smith was not entitled to demand of the Memphis City Bank said 110 shares of stock mentioned above, until he paid in full, according to their terms, said notes made by L. B. Eaton and indorsed by W. J. Smith or made tender of payment in full, which said notes are specified in said extension agreement as follows: (a) Note $4,600, January 4, 1895, at 1 year, with interest, indorsed by W. J. Smith; (b) note $4,500, January 4, 1895, at 1 year, indorsed by W. J. Smith; (c) note $15,502.30, January 4, 1895, at 1 year, indorsed by W. J. Smith; (d) note $4,200, January 4, 1895, at 1 year, indorsed by W. J. Smith; (e) note $5,000, January 4, 1895, at 1 year, indorsed by W. J. Smith; (f) note $4,000, January 4, 1895, at 1 year, indorsed by W. J. Smith."

The circuit judge modified the language just preceding the list of notes by striking out the words "or made tender of payment in full," and substituting therefor the following: "Or made an offer to pay in full, and was able to pay."

With this modification, he gave the whole instruction to the jury as requested; that is, gave the instruction as modified. This modification is made the subject of the fourth assignment of error.

The second and fourth assignments will therefore be considered together.

There was evidence tending to show the existence of all the facts referred to and indicated in the instruction as originally presented to the court, except the making of an actual tender. There was also evidence tending to show that the whole amount of indebtedness for which collaterals were bound was $59,002.30, consisting of the two notes of $16,100 and $5,100 made by Smith to Eaton, and the six notes above tabulated, for which W. J. Smith was L. B. Eaton's indorser. There was also evidence tending to show, as appears from the testimony of the defendant in error Smith, that a short time before the property was sold, and after it had been advertised for sale, said defendant in error Smith, in company with his attorney, H. F. Dix, went down to the Memphis City Bank to see what could be done about the debts, and with a view of finding out the exact amount due, and that he was prepared to pay whatever might be due, or, as he expresses it, to "redeem the property;" that he made an effort to ascertain from the bank what his whole indebtedness was, including the indorsements

for Eaton, with a view to settling the whole, but that the bank, instead of indicating to him the amount he owed personally and as indorser for Eaton, separately and distinct from Eaton's individual debts on which he was in no wise bound, said that Eaton owed so much, and just to pay the whole thing and take it (the property), meaning the property which he and Eaton had pledged, and which is the subject of the present suit, and that by the "whole thing" was meant all the indebtedness, including about $40,000 that Eaton owed, upon which he (Smith) was in no way bound; that Mr. Jno. Frost, speaking for the bank, demanded that he pay the "whole thing," meaning by the "whole thing" what has just been stated.

In order to properly understand the question made in the assignment now under examination, and to appreciate the bearing of the change which was made by the circuit judge in the instruction above mentioned, it will be necessary to consider almost the whole of the charge in connection with it. It must be premised that the instruction above referred to was presented to the circuit judge before his charge was delivered to the jury. However, in order to comply with the rule applicable to requests, the same request was offered to the circuit judge after he had delivered his charge, and he then declined to give it in the exact form in which it was presented. But he had already incorporated the whole of it in the body of his charge, word for word, with the exception of the change above mentioned, whereby he

left out the words "or made tender of payment in full,"
and substituted therefor the words "or made an offer to
pay in full, and was able to pay." In the opening of
the charge the circuit judge stated the contention of the
defendant in error (plaintiff below) on this branch of
the case as follows: "In their declaration, plaintiffs
claim that, being possessed of the abstract property and
stock set forth and described with particularity in the
declaration, they pledged the same by way of security
to the defendant, the Memphis City Bank, to secure cer-
tain debts which the plaintiffs owed said bank, and that,
upon the maturity of the debts for which said properties
were pledged, they (the plaintiffs) went to the proper
officers of the defendant for the purpose of understand-
ing definitely the exact amount due the bank, and for
which said collaterals had been pledged, with the view
of paying whatever amounts were secured by the pledge
of said properties and stock, so as to release the collat-
eral security. The plaintiffs further claim that the de-
fendant, through its officers, refused and declined to
make any statements as to the amount due by Eaton
and Smith, and the amount due by W. J. Smith as in-
dorser for L. B. Eaton, and, on the other hand, stated,
in substance, that the bank would not release said col-
laterals and turn the same over to Eaton and Smith un-
less they (Eaton and Smith) would not only pay all the
indebtedness of Eaton and Smith for which said col-
laterals were pledged, and the notes of L. B. Eaton in-
dorsed by W. J. Smith, but in addition would also pay

the individual notes of L. B. Eaton which were not indorsed by W. J. Smith."

After adverting to some other matters, the court returned to the same subject, and continued as follows: "The court charges you that the bank had the right to demand of General Smith the payment of every dollar due on the joint notes of Eaton and Smith, and the notes of Eaton indorsed by Smith.

"It had no right to demand of Smith the payment of the paper due by L. B. Eaton alone, or to hold the securities deposited for the payment of the joint notes of Eaton and Smith, and notes of Eaton indorsed by Smith.

"To refuse to deliver the collaterals upon an offer, coupled with an ability to pay the joint notes of Eaton and Smith, and the paper of L. B. Eaton indorsed by Smith, unless the individual notes of L. B. Eaton were paid, would be such an act of conversion as would make the bank liable to the extent of the market value of the collaterals held by the bank at the time."

Then followed, in the body of the charge, word for word, with the modifications above mentioned, the request of the plaintiff in error above set out, and which the court below adopted, and, as stated, imbedded it in the body of the charge.

After referring to another branch of the case, the court then continued on the same subject as follows: "The court charges you that if you find from the evidence that W. J. Smith went to the defendant bank prior to March 13, 1897, for the purpose of ascertaining the exact amount necessary to redeem the collaterals set forth

and described in the declaration, and prepared to then pay such indebtedness and redeem said collaterals, and the bank decline to consider his offer unless he would not only pay the sum for which said collaterals were pledged, but would also pay the individual debts of L. B. Eaton, for which said collaterals were not pledged, and declined to release said collaterals unless the unindorsed notes of L. B. Eaton were also paid, then the court charges you that this was, in law, a conversion of said collaterals by the bank, and entitled the owners of the collaterals, at their election, to sue for the value of the same."

When the whole charge upon the special subject under examination is considered together, it is perceived that the alteration which the plaintiff in error now complains of, in the matter which its counsel had formulated for use by the circuit judge in the preparation of his charge, could not have been misunderstood by the jury, and was in harmony with the general trend of the charge upon that subject. It is also perceived that all the instructions, as given to the jury upon the subject, were based upon evidence in the record, which had been submitted to the jury. So, the real question is whether the whole instruction given to the jury upon this subject was correct. This in turn resolves itself into the question whether, under the facts assumed or indicated, the defendant below would be guilty of conversion. We think it would be. The assertion of a right to hold the property as security for debts for which

it had not been pledged, and the refusal to deliver it up' except upon payment of those debts, was an unwarrantable assumption of authority over the property of defendants in error, and amounted to a conversion. *Gillet* v. *Bank of America,* 160 N. Y., 549-559, 55 N. E., 292; *Adams* v. *Clark,* 9 Cush.. 215, 57 Am. Dec., 41. Under the facts stated, an actual tender was not necessary. In 25 Am. Enc. Law, at page 904, it is said: "The actual production of the money is not required, where the party is ready and willing to pay it, but is prevented by the creditors declaring that he will not receive it, or by his making any declaration equivalent to a refusal to accept if tendered." In *Lamar* v. *Sheppard,* 84 Ga., 561, 10 S. E., 1084, it was held that, where the purchaser at a tax sale named as a sum he was willing to receive an amount larger than he was entitled to by law, this would relieve the owner from the necessity of producing the money at the time of making the tender, but it would not dispense with the necessity of his being fully ready to pay at the time of his offering to redeem. In *United States* v. *Lee,* 106 U. S., 196, 202, 1 Sup. Ct., 240, 27 L. Ed., 171, it was said: "It is a general rule that, when the tender of performance of an act is necessary to the establishment of a right against another party, this tender or offer to perform is waived or becomes unnecessary when it is reasonably certain that the offer will be refused." See, also, our own cases of *Bradford* v. *Foster,* 87 Tenn., 11, 9 S. W., 195; *Pearson* v. *Douglass,* 1 Baxt., 151.; *Rogers* v. *Tindall,* 99 Tenn., 356-363, 42 S.

W., 86; *Jones on Pledges & Collateral Securities*, 563-573. There is nothing in *Ball* v. *Stanley*, 5 Yerg., 199, 26 Am. Dec., 263, to the contrary. See, also, *Schayer* v. *Com. Loan Co.*, 163 Mass., 322, 39 N. E., 11:10; *Ratcliff* v. *Vance*, 2 Mill. Const., 239.

Numerous authorities are cited by plaintiff in error to the effect that a mere offer by a party is not a valid tender, but that the money should be produced with the offer. As a general proposition, this is, no doubt, true. But the defendants in error do not claim to have made an actual tender, nor did they introduce any proof tending to show such fact. Their contention is that they introduced proof tending to show the facts above referred to; that the question as to whether these facts were established was for the jury, and that, if these facts were true, they were excused from making an actual tender, and that they were entitled to an instruction from the circuit judge to the jury to that effect; and that, upon a finding of those facts, the plaintiff in error would be guilty of conversion.

It is insisted by plaintiff in error that the proof tended to show, in any event, that there was an offer to pay only $17,500. Probably this is the effect of Mr. Dix's testimony, but the testimony of Smith himself, which we have already referred to, does tend to show that he was ready, able, and willing to take up the whole amount.

Now, to recur to the special point on which the fourth assignment is made, to turn: It is observed from the

Bank v. Smith.

foregoing discussion—indeed, we have already held—
that this was a proper direction, when taken in connec-
tion with the rest of the charge upon the subject. It
would not have been correct to charge, as requested by
plaintiff in error, that there must be an actual tender,
in the face of facts which, if proven, would excuse an
actual tender, and when there was no proof in the rec-
ord tending to show that there was an actual tender.

The second and fourth assignments of error must
therefore be overruled.

The fifth assignment of error is based upon the follow-
ing excerpt from the judge's charge: "The court charges
you that the chancery record offered in evidence in this
case is not an adjudication of the questions involved in
this case, and cannot be considered as having settled
same."

In order to properly understand this assignment,
the following facts must be stated: On the 25th
of August, 1897, the defendant in error W. J. Smith
was sued in the chancery court of Shelby county upon
an original bill filed by the present plaintiff in error
against him as indorser for L. B. Eaton on sundry notes.
These notes were some of the same notes for which the
bank held the collateral, the conversion of which is the
subject of the present controversy, and which collateral
had already been sold at the time the bill in that case
was filed. In his answer to this bill, W. J. Smith, after
setting out various defenses, proceeded as follows: "De-
fendant would further show that on the 1st day of
March, 1897, the complainant held two notes made by

said L. B. Eaton and defendant—one for the sum of $16,100, dated January 9, 1895, and due thirty days after date; the other for the sum of $5,100, dated January 5, 1896, and due six months after date. On these two notes there was due complainant on March 1, 1897, the sum of about $21,000. These notes were secured by trust deed upon personal property, and a pledge, as collateral security, of stock in the Memphis & Shelby County Abstract Company, worth more than twice the amount due on said notes.

Defendant would show that on March 13, 1897, complainant caused all of said property to be sold, and the sum of $31,700 in cash was realized therefor. Before said sale, defendant tendered to complaint the amount due on said notes, and demanded the release of the security, which was refused by complainant.

"Complainant claims that, under a certain contract which it had, the said property and collateral security were held not only to secure said sum of $21,000 due on said two notes, but also any other sums that were due from said Eaton and defendant to said bank.

"Defendant wants it distinctly understood that he does not intend, by anything stated here, to estop himself from claiming hereafter that said sale of the personal property and collateral securities above described was void, or that he has the right to have said sale set aside.

"Defendant was ready before sale, at the time of the sale, and now is ready, to pay complainant the amount due on said notes of said complainant, if said complainplainant will release said property and security, all of

Bank v. Smith.

which were at said sale purchased by complainant, and are still by complainant owned.

"He reserves the right to take such action as may be to his best interests, and so securing all his rights. Defendant would show that after sale complainant applied the amount in excess of $21,000 which satisfied said notes, not to the payment of the indebtedness of said Eaton and defendant to complainant, as, under complainant's claim, should have been done. The said notes were both made by Eaton and defendant jointly. The property conveyed and the stock pledged were all the joint property of Eaton and the defendant. Complainant knew this fact, and yet, instead of applying said surplus to the payment of the notes of said Eaton indorsed by defendant, complainant applied only the sum of $3,197.95 on said notes, and the balance ($7,502.75) is unaccounted for to defendant.

This amount, if complainant's claim made when the defendant tendered the amount of said two notes was correct, should have been credited on the notes of Eaton indorsed by defendant; and thus it is defendant says that all said notes have been paid by said L. B. Eaton."

A cross bill was filed by Smith for the purpose of securing credit for usury which had been charged to Eaton by the bank for money which the bank had lent to Eaton on the notes on which Smith was sued, and on other notes which Eaton had executed to the bank. Eaton was made a defendant to this cross bill, along with the bank, and filed an answer, in which he responded concerning the said matter of usury.

Such proceedings were had in the chancery case referred to, as that the amount of usury referred to was ascertained, and credit allowed therefor, and also credit was allowed on the notes sued on in that case for their proper proportion of the $31,700, proceeds of the collaterals and abstract property above referred to, with the result that there was found due against Smith on the said notes the sum of $9,988.75, for which a decree was entered against him.

In the present case, Smith and Eaton brought suit, as partners, for the conversion of the collaterals and abstract property referred to in the foregoing answer in chancery.

The question to be determined is whether the decree in the chancery cause amounted to an adjudication of the matters complained of in the present case.

In the brief for plaintiff in error it is insisted that an adjudication is final and conclusive not only as to the matters actually determined, but as to every other matter which the parties might have litigated and have had decided as essentially connected with the subject-matter of the litigation, and every matter coming within the legitimate purview of the original action, both in respect of matters of claim and of defense; citing *Knight* v. *Atkisson,* 2 Tenn. Ch., 284; *Burford* v. *Kersey,* 48 Miss., 643; *Bates* v. *Spooner,* 45 Ind., 489; *Estill* v. *Taul,* 2 Yerg., 467, 24 Am. Dec., 498; *Cromwell* v. *County of Sac,* 94 U. S., 351, 24 L. Ed., 195; *Case* v. *Beauregard,* 101 U. S., 688, 25 L. Ed., 1004. It is also insisted that the defendant must bring forward all defenses which he

had to the cause of action asserted in the plaintiff's
pleadings at the time they were filed; citing *Glenn* v.
*Savage,* 14 Or., 567, 13 Pac., 442; *Woodhouse* v. *Dun-
can,* 106 N. Y., 527, 13 N. E., 334; *Ellis* v. *Clarke,* 19
Ark., 420, 70 Am. Dec., 603; *Sauls* v. *Freeman,* 24 Fla.,
209, 4 South., 525, 12 Am. St. Rep., 190.   It is also said
that the record of the former judgment is competent
evidence in the second action when the point in issue
is the same in both, or when the question raised and to
be passed upon in the last case has already been deter-
mined in the first (*Sage* v. *McAlpin,* 11 Cush., 165) ; that
it is not the object of the suit, the recovery, or result of
the litigation, alone, that constitutes the estoppel, but
the facts put in issue and found, and upon which the
recovery is based—the facts in issue, as distinguished
from the evidence in the controversy (*Caperton* v.
*Schmidt,* 26 Cal., 479, 85 Am. Dec., 187) ; that it is not
necessary to the conclusiveness of the former judgment
that issue should have been taken upon the precise point
which it is proposed to controvert in the collateral act-
ion, but it is sufficient if that point was essential to the
former judgment (*Lee* v. *Kingsbury,* 13 Tex., 68, 62 Am.
Dec., 546) ; that every point which has been either ex-
pressly or by necessary implication in issue, which must
necessarily have been decided in order to support the
judgment or decree, is concluded (*Board of S.* v. *R. Co.,*
24 Wis., 124) ; that it is allowable to reason back from a
judgment to the basis on which it stands, upon the ob-
vious principle that where a conclusion is indisputable,

and could have been drawn only from certain premises, the premises are equally conclusive and indisputable with the conclusion, and, if a judgment necessarily determines a particular fact, that determination is conclusive, and requires the same fact to be determined in the same way in all subsequent actions between the same parties, and that a fact is necessarily determined to exist or not to exist if its existence or nonexistence is required to support the judgment rendered (*Duncan* v. *Bancroft,* 110 Mass., 267; *Davis* v. *Demming,* 12 W. Va., 246; *Dorris* v. *Erwin,* 101 Pa., 239). We have no fault to find with the general principles thus announced. It has been held, however, that, in order that a judgment may be effective as *res adjudicata,* it is essential that the party sought to be precluded thereby should have sued or been sued in both cases in the same capacity or character, and to enforce the same right. *Melton* v. *Pace,* 103 Tenn., 484, 53 S. W., 939. It was accordingly held in that case that children inheriting from both father and mother were not estopped to set up title to the whole of a tract of land inherited from the mother, by reason of the fact that a part of it had been, by inadvertence, embraced in the description of a tract which they, as heirs of their father, had brought to sale by decree for foreclosure of a mortgage, especially where the purchaser had the fullest notice of the state of the title. It has also been held that, to make a judgment or decree in one suit a bar to another suit between the same parties, it must appear not only that the subject-matter of

the two suits is the same, but that the proceedings were for the same object and purpose, the same point being directly in issue. *Coulter* v. *Davis,* 13 Lea, 451. It was accordingly held in that case that a decree in chancery, on final hearing, in dismissing a bill to perpetually enjoin a nuisance (the flow of water over the complainant's land by reason of a milldam), was no defense to an action at law brought by the same party against the same defendant to recover damages for the overflow. It was also held that a judgment in favor of the defendant, brought by the husband and wife, is ordinarily no bar to a suit brought by the husband alone. *Railroad* v. *Adkins,* 2 Lea, 248. It has also been held that, in an action of ejectment, a decree of partition between the parties to the bill filed for that purpose is not conclusive of the right; the title not being involved in a suit for partition, nor in fact adjudicated by the court. *Nicely* v. *Boyles,* 4 Humph., 177, 40 Am. Dec., 638. See, also, *Swaggerty* v. *Neilson,* 8 Baxt., 32; *Walker* v. *Day, Griswold & Co.,* Id., 77; *Shannon* v. *Woollard,* 12 Lea, 663; *McKissick* v. *McKissick,* 6 Humph., 75; *Hurst* v. *Means,* 2 Sneed, 546.

To briefly apply these principles to the present case: The chancery cause was really between the bank and Smith alone. The present suit is one brought by Smith & Eaton, as partners, against the bank. It is true that in the chancery case Eaton was made a defendant to the cross bill, but the only issue made in that proceeding was as to usury. In the chancery case Smith was sued

as indorser of Eaton's notes. In the present proceeding Smith & Eaton appear in a different capacity—as pledgeors of personal property, seeking to hold the pledgee liable for conversion. In the chancery case the question of conversion was mentioned, but the defendant clearly indicated that he did not desire or intend to present that matter for adjudication. His attitude was that, whereas the property was worth a great deal more than it sold for, yet, upon the complainant's own contention, and treating it as accountable in that case only for the sum of $31,700, that sum had not been correctly credited. There is no real antagonism between the former case and the present.

We do not hold that the defendant in the chancery cause could, by mere reservation, in terms, in his pleadings, hold back matters for future litigation that should, under the rules applicable to the subject, and which we are now considering, be brought forward for adjudication; but, where there is no real inconsistency between the attitude occupied in the former litigation and that occupied in subsequent litigation, we do not think that the former should be held a bar to the latter.

For the reasons stated, we think this assignment should be overruled.

There are numerous other assignments of error, all of which have been considered and overruled, and need not be specially mentioned here.

It results that there is no error in the judgment of the court below, and it must be affirmed.